## CAMPBELL v. THE STATE.

HINES, J. 1. The defendant was convicted of the murder of Will Gibbons. The evidence for the State was substantially as follows: On March 10, 1912, the defendant and his brother, Peter Campbell, riding in separate buggies, drove up and stopped in front of the dwelling of Sis Gibbs. The deceased was sitting to the right of the fireplace, next to the door, and leaning back against the wall. Sam Gibbons was standing on the other side of the fireplace. Peter Campbell asked Phil Pool for a drink of water, and Pool told him to come and get it. The defendant then got out of his buggy and came into the house. He had his hands in his overcoat pockets. The water was in the kitchen. When the defendant came in, he walked as though he was going into the kitchen

to get a drink. When he got nearly to the middle door, he said: "Don't a God damn one of you move," pulled his pistol out, and pointed it at the deceased, who said: "James, don't do that," when the defendant shot and killed him. He then immediately shot and killed Sam Gibbons. At the time the deceased was shot and killed, he did not have any weapon in his hand, and was not doing anything to the defendant. There was evidence tending to show that the defendant entertained bad feelings toward the deceased and Sam Gibbons, a brother of the deceased, because Sam Gibbons had, sometime before, eloped with the wife of the defendant, and that the deceased had aided his brother in eloping with the defendant's wife. There was evidence that the defendant started into the house, took his pistol out of his pocket, and carried it by his side as he entered the house. After the homicide the defendant escaped, went to Ohio, and remained there until 1921, when he was arrested and brought back to Georgia to be tried for this offense. The evidence for the defendant was substantially as follows: The defendant and his brother drove up to the house of Sis Gibbs, and the defendant asked Phil Pool to bring him a drink of water. Pool told him to come in and get it. The defendant got out of his buggy and came into the house after the water. As he was going through the front room of the house to the kitchen where the water was, the deceased said to the defendant: "Oh, yes, God damn you, we have got you now, we will fix you now," and the deceased, with an open knife and razor, and his brother, with an open knife, rushed at the defendant. The defendant said to the deceased: "Get back, get back, Will." The deceased declined to stop, but he and his brother kept advancing upon the defendant, when the latter shot and killed Will Gibbons, and then shot and killed Sam Gibbons. Shortly after the killing a razor was found lying under the deceased. Will Gibbons was shown to be a man of bad and violent character. There was evidence that Will and Sam Gibbons said, on the day before the homicide, that they would get the wife of the defendant or would get him. *Held*, that, the evidence submitted by the State making a case of unprovoked murder, and the evidence introduced by the defendant making a case of justifiable homicide, the evidence did not authorize and require the court to charge the law upon the subjects of mutual combat and of voluntary manslaughter, either generally or as applicable to mutual combat. *Crawford* v. *State*, 149 *Ga.* 485 (100 S. E. 633); *Jordan* v. *State*, 117 *Ga.* 405 (43 S. E. 747); *James* v. *State*, 123 *Ga.* 548 (51 S. E. 577); *Brown* v. *State*, 151 *Ga.* 497, 501 (107 S. E. 536).

2. Phil Pool was sworn as a witness for the defendant. Under his evidence the jury was authorized to find that the defendant killed the deceased in self-defense. For the purpose of impeaching this witness, the court permitted the State to introduce in evidence a written statement, in the shape of an affidavit, purporting to have been made by this witness in the State of Ohio, and to have been sworn to and subscribed by him before a notary public of that State, in which the witness stated that he was not at the scene of the homicide, but two blocks away when he heard five shots, that when he arrived he found the defendant and Jim Gibbons in the yard, that the .defendant was getting ready to leave, and that upon entering the house he found the body of

Will Gibbons lying across the front door and the body of Sam Gibbons lying in the door of the middle room. This paper was exhibited to this witness upon his cross-examination, and he was questioned as to its execution. He swore that the signature on the paper was his genuine signature, but that when he wrote his signature he wrote it on a blank piece of paper, that he did not make the statements contained in this paper, that he knew nothing of the contents of the paper, and that none of the facts set forth in this instrument were written on the paper at the time he signed it. Counsel for the defendant objected to the admission in evidence of this alleged affidavit, on the ground that the uncontradicted evidence of the witness showed that he did not subscribe to the facts therein set out, knew nothing of its contents, and only signed a blank piece of paper. The court overruled this objection, and admitted this document. To this ruling the defendant excepted and assigns error thereon in this court. *Held:* (1) Proof of the execution of a writing by the subscribing witness is not required when the maker of the instrument testifies to its execution (Civil Code of 1910, § 5833, par. 5); and when the subscribing witness is inaccessible, proof of the actual signing by, or the handwriting of, the alleged maker, is sufficient. Civil Code (1910), § 5834. (2) When the maker of the instrument referred to above testified that his signature thereto was genuine, the court properly admitted it in evidence, notwithstanding the fact that in the same breath he testified that when he put his signature on this paper it was a blank piece of paper, that he did not make the statements contained in this paper, and knew nothing of the contents thereof. The jury might believe the portion of his testimony that his signature to this instrument was his genuine signature (which proof rendered the document admissible in evidence), and disbelieve that part of his testimony that he made this signature on a blank piece of paper, that he did not make the statements contained in the paper, and that he knew nothing of the contents of the paper; or the jury could believe his testimony in toto as to the circumstances under which his signature was affixed to this paper, in which event the statements therein would not have the effect to impeach the witness, but should be rejected by the jury; but the latter result did not make the introduction of this paper erroneous. On the right of the jury to believe in part, disbelieve in part, or believe all, of the testimony on this subject, see *Owens* v. *State*, 120 *Ga.* 296, 303 (48 S. E. 21); *Sappington* v. *Bell*, 115 *Ga.* 856 (42 S. E. 233). (3) While facts testified to by a disinterested witness who is in no way discredited, the same being within his knowledge, and in no way improbable or in conflict with other evidence, are to be taken as legally established, there was evidence tending to discredit this witness who was called to prove the execution of this instrument, and the jury could disregard his evidence in part, or accept all of it. 10 R. C. L. 1006, § 194. For this reason the trial judge did not err in admitting in evidence the instrument purporting to be an affidavit of the witness sought to be impeached by statements therein contradictory of his testimony on the trial of the case, it being a question of fact for solution by the jury whether that instrument was

in its present shape, when signed by the witness, or a mere blank piece of paper when his signature was thereto attached.

*Judgment affirmed. All the Justices concur, except Russell, C. J., dissenting.*

### No. 3880. JANUARY 16, 1924.

Murder. Before Judge Wright. Floyd superior court. June 30, 1923.

*Porter & Mebane,* for plaintiff in error.

*George M. Napier, attorney-general, E. S. Taylor, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.