45616.   MACON-BIBB COUNTY HOSPITAL
AUTHORITY v. APPLETON.

ARGUED SEPTEMBER 14, 1970—DECIDED FEBRUARY 9, 1971—
REHEARING DENIED MARCH 10, 1971—CERT. APPLIED FOR.

*Harris, Russell & Watkins, Philip R. Taylor, Joseph H. Chambless,* for appellant.

*Melton, McKenna & House, Andrew W. McKenna, Buckner F. Melton,* for appellee.

JORDAN, Presiding Judge. 1. "In the absence of anything to the contrary, every adult is presumed to possess ordinary intelligence, judgment, and discretion. *Hendrix v. Vale Royal Mfg. Co.,* 134 Ga. 712 (68 SE 483)." *Edwards v. Atlanta, B. & C. R. Co.,* 63 Ga. App. 212, 215 (10 SE2d 449). "Certainly, a man cannot heedlessly rush into grave peril of the existence of which he is perfectly aware, and then hold anyone else, whether negligent or not, responsible for the consequences." *City of Columbus v. Griggs,* 113 Ga. 597, 598 (38 SE 953, 84 ASR 257).

The grave peril here involved would have been obvious to a normal adult, and the applicability of the foregoing principles to the present case depends upon whether the evidence of the mental condition of the plaintiff would support a jury determination that he was incapable of understanding the danger to which he sub-

jected himself, and therefore not responsible for the consequences.

Although the plaintiff had undergone treatment as a mentally disturbed person, he had never been adjudged mentally incompetent. On the advice of his attending physician, a psychiatrist, he entered the hospital voluntarily on December 20, 1968. This physician diagnosed his condition at that time as "psychotic depressive reaction." Explaining the condition in lay terms he stated that it "does not necessarily mean that a person cannot think. It simply has to do with his mood. It has to do with a deep depressed mood. I think many of us have experienced it to a slight degree on a Monday morning. What we call a 'blue Monday' when you just feel bound. Well, this is an extension of this particular feeling to the point where the individual is really sick and can't do for himself. He feels immobilized and feels perfectly miserable, but he can still think coherently and logically and reason." This witness also testified that the patient's electroencephalogram disclosed an abnormal wave pattern.

The plaintiff, age 28 at the time of trial in November, 1969, had been laid off in 1968 from his job as a welder. He testified that he began to experience the condition which caused him to seek psychiatric treatment because he was unemployed and because of the lack of money to pay hospital bills for his wife's operation for the removal of her gall bladder, her inability to work, and things of that nature. While in the hospital from December, 1968, to January 14, 1969, he recalled receiving three or four shock treatments. According to his physician he actually received five of these treatments, commencing about January 1, 1969. He left the hospital on January 14, 1969, contrary to the advice of his physician. While out of the hospital he recalled going to Birmingham, Alabama, to pick up his daughter, who was living with friends, and he also remembered breaking up his guitar because he couldn't play it.

On January 17, 1969, a traffic policeman of the City of Macon received a call to pick up a "demented" person at an apartment address. A "bluecoat" policeman arrived at the address moments before—"three or four car lengths" or "maybe twenty or twenty-five steps ahead." The traffic policeman observed scattered clothes, furniture out of place, and a broken guitar with the neck sticking

out of the garbage can. The plaintiff, who was not at the apartment when the policemen arrived, returned about this time, accompanied by another person. The traffic policeman described the plaintiff as "wild-eyed." In a conversation with the plaintiff this policeman suggested that the plaintiff go to the hospital. The plaintiff then said, "I done left the hospital. They won't take me back." After further conversation he said, "If you will take me, I will go, but I won't go with nobody else." The plaintiff then accompanied this policeman to the emergency room of the hospital voluntarily, without physical restraint and without untoward incident.

A hospital policeman at the emergency room of the hospital engaged the plaintiff in a conversation for about an hour, or an hour and a half. They walked together to the patient's assigned room on the seventh floor of the hospital. This witness stated that the plaintiff was cooperative and rational, although the plaintiff did tell this witness that his wife was trying to put him away.

The nurse on duty in the psychiatric ward recalled first seeing the plaintiff on January 17 around 11 a.m. She had become acquainted with him when he was previously undergoing treatment in the hospital. He told her he was glad to be back and that he wanted help. In her words, "He seemed quite rational, very pleasant, very cooperative and he didn't give us any trouble at all." At 1 p.m. he accepted voluntarily a dosage of 200 milligrams of Thorazine, the dosage prescribed for him to receive three times daily. This medicine is elsewhere identified as a tranquilizer. The nurse completed her duty in the ward at 3 p.m., and the last time she saw the plaintiff before leaving he was all right.

The nurse who came on duty at 3 p.m. recalled that shortly after the change of shifts the plaintiff announced he was going to get out of the hospital, and that he made this statement more than once. In one of his statements he said he wanted to see a lawyer about getting another patient out of the ward because "he didn't feel she was sick." Although there is no court order in the evidence it appears that preceding his announced intention he had received information to the effect that because of a court order which his wife brought to the hospital he would not be permitted to leave the hospital voluntarily. During the afternoon he was al-

lowed freedom of movement in the ward. He was originally placed in Room 710.

About 4 p.m., while the plaintiff was in this room, the nurse discovered that a security screen in the room was ajar and moved the plaintiff to Room 701. The only way the nurse knew that a security screen could be opened was by means of a key, which was kept locked up and was not available to patients. Suspecting that the plaintiff had opened the screen and that it might be defective, she conducted an investigation to determine the means used—"we went over it with a fine-tooth comb almost"—but nothing was found except a bent ashtray. She questioned the plaintiff and he denied opening the screen. He appeared calm and rational. Although he was allowed the freedom of the ward, measures were instituted to check on his presence every 10 or 15 minutes. One attendant was specifically instructed to check every 15 minutes, in addition to the nurse's expressed intention of periodically checking. At the 6 p.m. medication period the plaintiff still asserted he was going to get out and refused to take his prescribed dosage of Thorazine. She called five attendants. The patient was sitting down and the five attendants were standing behind the nurse. He took the medicine orally. The dosage of 200 milligrams was a "rather large dose" but the plaintiff had a high tolerance. The plaintiff was calm after taking this medicine and made no further statements to this nurse about wanting to get out of the hospital. Around 8 p.m. this nurse saw him standing at the door of his room. He appeared to be calm. She glanced in his room to see if anything was in disarray. Some 15 minutes later she went down the hall to check on the plaintiff and discovered that the screen in his room was open and that he was gone.

The testimony of an attendant in the ward who came on duty at 3 p.m. is in substantial accord with that of the nurse on duty. The attendant was instructed to check on the patient every 15 minutes or less. The last time this attendant saw him, about 15 minutes before his fall, he came down the hall from the television room for the attendant to light his cigarette, walked back up the hall to the television room, came out again and went to his bedroom. While checking on the patient the attendant also checked his room and saw nothing in disarray. Both before and after the

medication about 6 p.m. he told this attendant he was going to get out of the hospital before the night was over. This attendant had no reason to believe that the patient could open the screen in the room where he had been transferred. Although patients who were "violent or very hostile" were physically restrained, the plaintiff was not acting in this manner.

We conclude from the foregoing evidence that whether the plaintiff should be accorded the responsibility of a normal adult, acting as a reasonable man, in respect to his own conduct as the cause of his injuries, was a matter for jury determination.

2. Inasmuch as a jury could determine from the foregoing evidence that the plaintiff may not have been accountable for his own unorthodox conduct which caused his injuries, the controlling issue on this appeal is whether under the evidence a jury could also determine that the hospital, through its agents and servants, failed to exercise the requisite care necessary to prevent the occurrence.

In the posture of the case as presented on appeal we think the defendant is bound by the action of the trial judge in placing on the hospital and its agents and servants a duty to exercise ordinary care. The evidence fails to establish as a matter of law that the plaintiff was not a pay patient and "it is well established that a hospital owes a duty to a pay patient to exercise such reasonable care in looking after and protecting the patient as his condition, known to the hospital through its agents and servants charged with the duty of looking after and supervising him, may require, but the hospital is not an insurer of the patient's safety. 26 AmJur 595-596, Hospitals and Asylums, § 14; 41 CJS 349, Hospitals, § 8 (3). See for collection of Georgia Cases, 12A Ga. Digest 239, Hospitals, § 7." *Hospital Authority of the City of St. Marys v. Eason,* 222 Ga. 536, 539 (150 SE2d 812).

Assuming that the announced intention of the plaintiff was sufficient to place the hospital and its agents or servants on notice that he would attempt to breach the physical barrier imposed by the locked security screens, the evidence amply demonstrates that it would be impossible to break one of these screens, unless one was possessed of gargantuan strength, or was ingenious enough, using any materials at hand, to devise some means of unlocking a

screen. The screens had been used for a number of years, and BIC pens were normally issued to patients on request, as no one had the slightest reason to believe that a BIC pen could be used as a substitute for the key designed to unlock the screens. Even if we assume that a continuous surveillance of the plaintiff's activities would have prevented his self-caused injuries, to impose such a duty on the hospital and its agents or servants would in effect impose a duty of insuring his safety, and would far exceed a standard of reasonable care under the circumstances here shown.

We recognize, of course, that ordinarily what constitutes negligence, except negligence per se, is for jury determination, but from a perusal of the entire evidence in the present case we find no basis whereby a jury could conclude that the hospital, through its agents or servants, failed to exercise reasonable care for the safety of the plaintiff.

3. The trial judge erred in refusing to direct a verdict for defendant and in refusing to grant judgment n.o.v.

*Judgment reversed. Bell, C. J., Hall, P. J., Eberhardt and Deen, JJ., concur. Pannell, Quillian, Whitman and Evans, JJ., dissent.*

PANNELL, Judge, dissenting. I dissent from the ruling in Division 2 of the opinion and the judgment of reversal. In my opinion, the liability of the defendant hospital authority was clearly a question for the jury to determine. Since the evidence disclosed that the plaintiff had succeeded in opening one of the security screens and that these screens could not be opened except by one "possessed of Gargantuan strength, or ingenious enough, using any materials at hand, to devise some means of unlocking a screen" the hospital was put on notice either that the plaintiff possessed the Gargantuan strength necessary or was ingenious enough using any materials at hand, to devise some means of unlocking a screen. The hospital attendants assumed the plaintiff had unlocked the screen with a bent ashtray. It was a jury question as to whether this assumption was arrived at in the exercise of ordinary care and whether a search of the plaintiff was required in the exercise of ordinary care. The majority reaches a conclusion that "no one had the slightest reason to believe that a BIC pen could be used as a substitute for the key designed to unlock the screens." While this conclusion might very well be au-

thorized by the evidence, it is not demanded. This is a question for the jury only under all the facts and circumstances of the case. The jury was authorized to find that, in the exercise of ordinary care, the hospital should have known a BIC pen would fit the lock on the retaining screen. If "[a] continuous surveillance of the plaintiff's activities was necessary" (and a jury could have so found), then the imposition of such duty does not make the hospital an insurer of the plaintiff's safety. See in this connection *Emory University v. Shadburn,* 47 Ga. App. 643 (1) (171 SE 192); *Lathan v. Murrah, Inc.,* 121 Ga. App. 554, 557 (174 SE2d 269). A jury may find a greater *amount* of care may be required under some circumstances to meet the legal standard of ordinary care than would be required if the circumstances were different. See in this connection, *Wright v. Dilbeck,* 122 Ga. App. 214 (8) (176 SE2d 715). In my opinion, the evidence was sufficient to authorize the verdict rendered.

I am authorized to state that Judges Quillian, Whitman, and Evans, concur in this dissent.

EVANS, Judge, dissenting. Plaintiff was admitted to the Macon Hospital for psychiatric treatment, and fell from a 7th story window approximately 50 feet to the ground and suffered serious injuries. He filed suit against the hospital, and verdict and judgment were rendered in his behalf. During the trial defendant moved for a directed verdict and for a judgment n.o.v., which motions were overruled by the trial judge and defendant appeals to this court. The majority opinion holds that there was a jury question as to whether plaintiff was responsible for his actions as a normal adult. The majority opinion further holds that it must be presumed that patient was a pay-patient and entitled to have the hospital exercise reasonable care in looking after and protecting him, to the extent that his condition as known to the hospital might require. The majority opinion then holds that although plaintiff had announced his intention of "breaching the physical barrier" (escaping from the hospital) that to require the hospital to maintain continuous surveillance of plaintiff's activities would, in effect, "impose a duty of insuring his safety, and would far exceed the standard of reasonable care, under the circumstances here shown." The majority opinion states that it recognizes that

negligence is for a jury's determination but that the evidence in this case does not show the hospital failed to exercise reasonable care for the safety of plaintiff, and reverses the trial court in refusing to direct a verdict for defendant and in refusing to grant a judgment n.o.v.

It is difficult to follow the reasoning of the majority. The majority correctly states: "It is well established that a hospital owes a duty to a pay-patient to exercise such reasonable care in looking after and protecting the patient as his condition, known to the hospital through its agents and servants charged with the duty of looking after and supervising him, may require. . ."

What was the condition of the plaintiff as known to the hospital? What was reasonable care on the hospital's part in looking after and supervising him, with such knowledge?

The transcript shows that plaintiff had been a patient in this same hospital on prior occasions for shock treatment and that such treatments are "what they call last resort when medicine doesn't help." He was last admitted on January 17, 1969, suffering with "psychotic depressive reaction," which means that he could not even distinguish right from wrong. The admitting physician entered on the hospital records as to this plaintiff: "27 year old white male was first seen in my office in an acute state of agitated depression stating that he can't sleep, can't eat, feels angry, feels like he is going to explode inside. He doesn't care about anything, cannot make decisions, feels suicidal at times. He is frightened *that he might hurt himself."* (Emphasis supplied.)

The language emphasized is very important—proving the patient was "out of his mind" and needed constant attention. This was indeed a signal for alarm and was quite prophetic.

The policeman who brought him to the hospital had received a Signal 16, which means a "demented person,"' and at the time and place of taking him in custody, saw scattered clothing, displaced furniture, a broken guitar, and noted that he was wild-eyed. When he brought the patient to the hospital he told the officials that he had one that could give some trouble; that he is wild and tore up his apartment. The policeman told the hospital that *it would have to watch him.* At the desk the policeman told the lady in charge: "If he hurts someone we cannot be responsible—we

have done all we can do. Don't blame the police department if something happens. I am sorry, this is all we can do." The patient was quick—jumpy—nervous.

Thus, at this point the hospital fully knew that it had in its care a wild man who was frightened and might hurt himself, and for whom the police refused to accept responsibility in the event that he hurt someone. What "reasonable care" did the hospital then exercise under these unusual circumstances?

About 4 o'clock on that day a hospital guard found the patient (plaintiff) standing in Room 710 with the screened window open. The screened window opened onto the roof. This was on the 7th floor. The nurse in charge (Miss Joan Elizabeth Reynolds) assumed that the patient opened the window himself, so she put him in another room, to wit: Room 701, which had the same type of screen on the window, that is, the same type of screen that she assumed he had just opened in Room 710. This unusual occurrence had never happened before in this hospital. One of the first statements he made to her was that he was going to get out of the hospital that day; and he continued to make that statement to the various hospital personnel with whom he came in contact. He was given 200 milligrams of Thorazine, which is a heavy dose. The nurse testified that she did not bind him down or use restraining devices to keep him in the bed, although she had such devices available. At 6 p.m. he refused to take his prescribed dosage of Thorazine and five attendants were called and he then took the medicine and repeated that he was going to get out of the hospital. He was not searched, nor was his bathrobe searched when he was placed in the room, although he continued to maintain that he was going to get out. It was determined by Glen Woolfolk, a hospital employee, and the head nurse, that the patient had opened the window in Room 710 and had determined to try to get out of the hospital. Glen Woolfolk expected him to try to get out and when he later heard that someone had fallen, he knew who it was. The chief engineer testified that the type of screen used on the 7th floor of the hospital was not designed for psychiatric wards, but was for protection type in use of less than maximum detention. It was testified that Central State Hospital uses the same type of screen, but also uses bars on the windows,

whereas no bars or locks on the windows were used in the Macon Hospital. Instead of maintaining constant surveillance over him by placing a guard in his room, and instead of confining him to his bed by the devices which were available for that purpose, the hospital contented itself with checking on him every 15 minutes. During one of the 14-minute periods when he was not being checked on, the plaintiff, in his demented state of mind, tied bed sheets together and tied them to the bed, removed the screen window as he had done in Room 710 and went through the window and fell approximately 50 feet to the ground.

Was this reasonable care "under the circumstances?" Was it even simple care? No, in my opinion, it was gross negligence. The majority opinion states that the "evidence amply demonstrates it would be impossible to break one of these screens unless one was possessed of Gargantuan strength, or was ingenious enough, using any materials at hand, to devise some means of unlocking a screen." How can the majority so contend when this same patient had opened an identical screen in an identical room during the same afternoon? The hospital knew he had opened the screen in Room 710; why should it not have expected that he would open the one in Room 701? The hospital knew that he was frightened and that he might hurt himself, and that the Police Department of the City of Macon was not willing to be responsible for him, and yet it failed to take proper steps to prevent his injuring himself.

The majority opinion asserts that the hospital was not required to maintain a continuous surveillance of plaintiff's activities, and to impose such duty on the hospital would impose a duty of insuring his safety, and would thus exceed the standard of reasonable care under the circumstances here. In support of this contention the majority opinion cites 26 AmJur 595-596, Hospitals and Asylums, § 14. But a careful reading of that section reveals this pertinent and meaningful language, to wit: "In some cases the failure of a nurse to give constant attention may amount to negligence." Citing Wetzel v. Omaha Maternity & General Hospital Assn., 96 Neb. 636 (148 NW 582, AC 1915B 1224). We feel this completely disproves the correctness of the position assumed by the majority opinion. Further, our Georgia courts have held to the same effect,

that is, that in some cases constant surveillance is necessary in order to exercise reasonable care. In the case of *Emory University v. Shadburn*, 47 Ga. App. 643 (2) (171 SE 192), the patient in a private hospital became delirious, which condition was known to the hospital, and this court held: ". . . the inference is authorized that the hospital authorities in charge of the patient and having knowledge of these facts should, in the exercise of due care, anticipate that the patient, should the opportunity be presented, would endeavor to leave the hospital by some means, as by jumping out of a window. Where the hospital authorities, with such knowledge, *neglect and fail to guard the patient and safeguard her against harm to herself, by failing to have a nurse on guard and in constant attendance on the patient,* and where by reason of such failure the patient leaves her bed and jumps out of a window and suffers physical injuries, an inference is authorized that the hospital is guilty of a negligent failure to exercise the duty owing to the patient, and is liable to the patient in damages therefor." (Emphasis supplied.) Again, in the case of *Lathan v. Murrah, Inc.*, 121 Ga. App. 554, 557 (174 SE2d 269) the question of a hospital's duty was discussed, and this court held: "However, if there be evidence from which the jury might find that the defendant owed a duty, under the circumstances, not to leave the decedent unrestrained, and that this duty was breached and was responsible for a fall, and that a fall did result, which caused or contributed to the decedent's death, the lower court would have erred in granting a directed verdict. There was evidence from which the jury could have determined the defendant owed a duty, under the circumstances, *not to leave decedent unrestrained, even momentarily;* that this duty was breached; and that defendant was responsible for the fall of plaintiff's mother." (Emphasis supplied.) Seven judges concurred in this opinion, and two dissented.

Reasonable care as to one person may be gross negligence as to another. There is no reason to try to guard the hospital room of a perfectly normal person whose mind is sound and who is not under the influence of drugs. But as to one who is out of his mind, likely to hurt himself, and has announced his intention to escape, and who has already demonstrated that he can escape, surely reasonable care required that he be restrained or that he be guarded.

The law is plain and needs no citation of authority here that negligence is to be decided by juries and not by judges. Further, a directed verdict must not be granted on motion if there is a conflict in the evidence, nor if the reasonable deductions and inferences do not demand it. *Code Ann.* § 110-104 (Ga. L. 1961, p. 216); § 50, CPA (Ga. L. 1966, pp. 609, 656; 1967, pp. 226, 237; 246, 248; *Code Ann.* § 81A-150). See also *Pritchard v. State,* 224 Ga. 776, 779 (164 SE2d 808). Further, all deductions and inferences arising from the evidence must be construed most favorably toward the party opposing the motion for directed verdict. *Jones v. Mayor &c. of Athens,* 105 Ga. App. 86 (1) (123 SE2d 420); *Curry v. Roberson,* 87 Ga. App. 785, 786 (75 SE2d 282). The question of directing a verdict is further compounded when we remember that a jury has the right to believe a part of what a witness testifies and to disbelieve a part thereof, especially where the witness has an interest in the case (such as an employee of the hospital or a physician). *Campbell v. State,* 157 Ga. 233, 235 (121 SE 306); *Adams v. Adams,* 218 Ga. 67 (4) (126 SE2d 769); *Powell v. Blackstock,* 64 Ga. App. 442 (5) (13 SE2d 503). How would the trial judge have known which parts of the testimony of defendant's witnesses, who had an interest in the case, to credit or discredit? For after all, it is only the jury that may believe in part and disbelieve in part, and not the judge. And how can this court know which parts of the testimony would have been believed by the jury, and which parts disbelieved?

For all of these reasons I would affirm the trial court in this case.

I also concur in the dissent by Judge Pannell.