Nicole L. ALTHAUS, a minor by Richard T. ALTHAUS and Cheryl Renee Althaus, her parents and natural guardians, and Richard T. Althaus and Cheryl Renee Althaus, Appellees,

v.

Judith A. COHEN, M.D. and University of Pittsburgh Western Psychiatric Institute and Clinic, Appellants.

Nicole L. ALTHAUS, a minor by Richard T. ALTHAUS and Cheryl Renee Althaus, her parents and natural guardians, and Richard T. Althaus and Cheryl Renee Althaus, Appellants,

v.

Judith A. COHEN, M.D. and University of Pittsburgh Western Psychiatric Institute and Clinic, Appellees.

Superior Court of Pennsylvania.

Argued Sept. 3, 1997.
Filed April 13, 1998.

Larry S. Silverman, Pittsburgh, for Cohen and University of Pittsburgh Western Psychiatric Institute and Clinic.

Martha S. Bailor, Pittsburgh, for Althaus.

Before McEWEN, President Judge, and CAVANAUGH, BECK, TAMILIA, KELLY, JOHNSON, HUDOCK, EAKIN and SCHILLER, JJ.

JOHNSON, Judge:

We are asked to decide whether a psychiatrist who treats a child for alleged sexual abuse owes a duty of care to the parents of that child where the psychiatrist negligently diagnoses and treats the child and then, based on that misdiagnosis, subsequently embarks upon a course of action that directly affects both the child and the parents, as the alleged abusers. This is an issue of first impression. We have considered the competing policies involved, the case law of Pennsylvania and other jurisdictions, and the particular circumstances of this case. In doing so, we must conclude that, despite the absence of a psychiatrist-patient relationship between the psychiatrist and parents in this case, the psychiatrist owed them a duty of care because the psychiatrist's actions extended well-beyond the psychiatric treatment of the child. Further, after reviewing all of the parties' issues in this cross-appeal, we affirm the judgment in all respects.

Nicole Lynn Althaus was born on April 10, 1975, to Richard and Renee Althaus (the Althauses). Beginning in 1990, a series of catastrophic illnesses struck the Althaus family when Renee was diagnosed with skin and breast cancer. Richard's mother was then diagnosed with diabetes and pancreatic cancer, from which she eventually died. As a result, Nicole's emotional and psychological well-being began to deteriorate.

Nicole confided this information to one of her teachers, Priscilla Zappa, and they became quite close. Zappa assisted Nicole in calling a cancer support hotline to provide Nicole with further emotional support during this time. Nicole then spoke to Connie Lappa, who was coincidentally Renee's counselor in a cancer support group at Magee Women's Hospital. After several phone conversations, Nicole confided in Lappa that her father had touched her inappropriately. Lappa then reported Nicole's allegations of abuse to the Allegheny County Children and Youth Services (CYS).

CYS then caused Nicole to be removed from her parents' home. CYS further referred the matter to the Mt. Lebanon Police Department which arrested Richard Althaus and charged him with sexually abusing Nicole. Subsequently, Dr. Susan Nathan, a clinical psychologist, referred Nicole to Dr. Judith Cohen and the Child and Adolescent Sex Abuse Clinic of the University of Pittsburgh Western Psychiatric Institute and Clinic (WPIC).

At trial, Dr. Cohen testified at length about the clinic's role in treating sexually abused children. Dr. Cohen stated that the clinic was a treatment program and did not provide forensic or investigative evaluations. N.T., December 12, 1994, at 16–18. She further stated that the determination of child abuse was made before the child came for treatment and, to that extent, the clinic relied "on the investigations provided by [CYS] and/or forensic evaluations done by independent evaluators of Family Intervention Center." Id. at 17–18. In accordance with her practice, Dr. Cohen did not make any determination about the truth of Nicole's allegations. Instead, Dr. Cohen relied on the conclusions made by CYS and Dr. Nathan that Nicole was sexually abused. Dr. Cohen accepted this determination despite the fact that Dr. Mary Carrasco, a physician who examined Nicole for physical signs of abuse, expressed her concern to Dr. Cohen about some of Nicole's allegations. Dr. Carrasco informed Dr. Cohen that Nicole had made disturbing allegations for which Dr. Carrasco

had found no supporting physical evidence. Dr. Cohen stated that she was not surprised that there was no physical findings since she, too, was somewhat skeptical about Nicole's allegations regarding ritualistic abuse. *Id.* at 38. However, Dr. Cohen's skepticism did not affect her acceptance that Nicole was sexually abused. She also made no independent investigation regarding the reports made by Nicole to other individuals. As a result, Dr. Cohen treated Nicole as though she were suffering from post-traumatic stress disorder and depression secondary to sexual abuse.

As Nicole progressed through therapy, her stories became increasingly outlandish, including not only sexual abuse but also ritualistic torture and the murder of several babies that Nicole claimed to have had via caesarian section. Her allegations of abuse widened to include all members of her immediate family, coworkers of her father, and eventually strangers. Consequently, Richard Althaus was arrested three times and Renee was arrested twice during the course of Nicole's treatment with Dr. Cohen.

Nevertheless, Dr. Cohen steadfastly refused to evaluate the credibility of Nicole's statements throughout treatment, despite her awareness of the criminal proceedings against the Althauses and the fact that many of Nicole's allegations of abuse could not be true. While Dr. Cohen was concerned about these fantastical allegations, Dr. Cohen generally avoided direct confrontation with Nicole because of her concern that Nicole would no longer trust her and because she feared that Nicole would make even more of such allegations.

During Nicole's treatments, Dr. Cohen refused input from the Althauses, as well as Dr. Alan Axelson, a child psychiatrist retained by the Althauses, and Dr. Hilda Schoor–Ribera, Renee Althaus's cancer support therapist. Despite Dr. Cohen's insistence that Nicole's treatment remained strictly therapeutic, she was actively involved in the criminal proceedings against Nicole's parents and the continued placement of Nicole in a foster home. At a meeting with members of the police investigation team, Dr. Cohen refused to comment on Nicole's credibility or to discuss ways to detect if a child

has been abused; she further informed the officers that it was their responsibility to determine whether Nicole was abused. N.T., *supra*, at 76–77.

Yet, Dr. Cohen attended several preliminary hearings related to the criminal proceedings against the Althauses and testified under oath that she believed that Nicole had been abused. *Id.* at 197. At Juvenile Court, she testified that Nicole's continued placement in foster care with Zappa was appropriate, despite Dr. Axelson's concern that Nicole's relationship with Zappa was unhealthy. N.T., November 22, 1994, at 80–82; December 5, 1994, at 76–77. Dr. Cohen explained her presence at the criminal proceedings stating that therapeutic treatment extended to providing emotional support to Nicole while she testified to matters regarding her abuse despite Dr. Cohen's knowledge that parts of Nicole's testimony at these proceedings were untrue. N.T., December 12, 1994, at 72.

When the criminal case against Nicole's parents came before the Honorable Robert E. Dauer, Judge Dauer ordered, over Dr. Cohen's objection, an independent psychiatric examination of Nicole. The prosecution and the Althauses' counsel agreed to retain Dr. Marshall Schecter.

Dr. Schecter retained two additional psychologists, and psychological testing was performed on Nicole, Richard and Renee Althaus. Dr. Schecter interviewed Nicole, Richard, Renee, Dr. Cohen and numerous health care professionals who had provided care to Nicole. He spoke to Nicole's grandmother, her brother, and Renee's therapist, Dr. Schoor–Ribera. Dr. Schecter reviewed all of Nicole's scholastic records and writings, and spoke with her at great length. Based on his extensive evaluation of Nicole, Dr. Schecter testified at the hearing that, in his opinion, Nicole suffered from a borderline personality disorder. He stated that he did not believe Nicole was ever abused and that her allegations of abuse stemmed from Nicole's inability to distinguish fact from fantasy. Dr. Schecter further testified that Nicole's inability to distinguish truth from fantasy rendered her incompetent to testify.

Dr. Cohen also testified at Nicole's competency hearing. Initially, she stated that, based on her therapeutic treatment of Nicole, she was in a better position than Dr. Schecter to assess Nicole's competence. *Id.* at 106. During cross-examination, however, Dr. Cohen conceded that many of Nicole's allegations were untrue, and that, at times, Nicole could not distinguish fact from fantasy. When Judge Dauer informed Dr. Cohen that the ability to distinguish fact from fantasy was a condition precedent to testifying under oath, Dr. Cohen advised Nicole not to testify. Consequently, Nicole did not testify and the Commonwealth withdrew the criminal charges filed against the Althauses.

The Althauses and their daughter Nicole then brought the present negligence action against Dr. Cohen and WPIC, on the theory that Dr. Cohen negligently diagnosed and treated Nicole and that this negligence exacerbated Nicole's undiagnosed borderline personality disorder. The Althauses further contended that Dr. Cohen owed them a duty of care because of her awareness that many of Nicole's allegations could not be true and because of her knowledge that these allegations were the basis of the criminal proceedings against them. The case was submitted to a jury, which returned verdicts in favor of both Nicole and her parents. Both parties filed post-trial motions that the court denied. This appeal by Dr. Cohen and WPIC and cross-appeal by the Althauses and their daughter Nicole followed.

On appeal, Dr. Cohen and WPIC argue that the trial court erred when it (1) held that a psychiatrist treating a child for alleged sexual abuse owes a duty of care to non-patient parents, as the alleged abusers and (2) refused to instruct the jury on both the Althauses' and their daughter Nicole's alleged contributory negligence.

In their cross-appeal, the Althauses and their daughter Nicole argue that the trial court erred when it: (1) concluded that the good faith immunity provisions of the child protective services law, 23 Pa.C.S. § 6318, precluded the Althauses from using Dr. Cohen's testimony from the various legal proceedings for the purpose of supporting their allegations of negligence; (2) precluded the

Althauses from submitting testimony relating to the results of Mr. Althaus's lie detector test and the fact that Dr. Cohen was aware that he had passed it; (3) refused to instruct the jury on the issue of punitive damages; and (4) concluded that Nicole Althaus was not entitled to delay damages.

We first address Dr. Cohen's and WPIC's argument that Dr. Cohen owed no duty of care to the Althauses because of the non-existence of a psychiatrist-patient relationship between them. Initially, we note that while we find no error with the trial court's imposition of a duty in this instance, we do so because of the particular circumstances of this case. In his Dissenting Opinion, our distinguished colleague, Judge Schiller, seems to pose the issue in a formulation that we are not, here, trying to answer. We do *not* conclude, as Judge Schiller charges, that a psychiatrist who treats a child for alleged sexual abuse owes an absolute duty of care to the parents of that child for negligent psychiatric *treatment* of that child. If that were all that happened here, we would not find that Dr. Cohen owed a duty to the Althauses. Dr. Cohen's conduct, however, extended far beyond the negligent treatment of Nicole Althaus. Here, Dr. Cohen actively participated in the criminal proceedings against the Althauses. She attended several preliminary hearings at Nicole's request and remained passive as Nicole made outlandish allegations against her parents and others—allegations that Dr. Cohen knew were not true. Though she recognized that, at times, Nicole could not distinguish fact from fantasy, she nonetheless allowed Nicole to testify to these allegations and, in doing so, essentially validated Nicole's unwittingly false testimony. Accordingly, because Dr. Cohen's actions extended well-beyond the psychiatric treatment of Nicole, we conclude that Dr. Cohen owed a duty of care to the Althauses and that the lack of a psychiatric-patient relationship does not provide blanket immunity to Dr. Cohen.

Pennsylvania courts have set forth the basic elements of a negligence claim as follows:

1. A duty, or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct, for

the protection of others against unreasonable risks.

2. A failure on [the actor's] part to conform to the standard required.

3. A reasonably close causal connection between the conduct and the resulting injury. . . .

4. Actual loss or damage resulting to the interests of another.

*Fennell v. Nationwide Mutual Fire Ins.*, 412 Pa.Super. 534, 539, 603 A.2d 1064, 1066–67 (1992), citing Prosser, Law of Torts, § 30, at 143 (4th ed.1971).

■ Whether a legal duty exists under a set of facts is a question of law. *Huddleston v. Infertility Center of America, Inc.*, 700 A.2d 453, 457 (Pa.Super.1997). Our duty analysis depends on many factors and is "necessarily rooted in public policy considerations, i.e., our ideas of history, morals, justice, and society in general in determining where the loss should fall." *Gardner v. Consolidated Rail Corp.*, 524 Pa. 445, 455, 573 A.2d 1016, 1020 (1990); *see also Troxel v. A.I. Dupont Institute*, 450 Pa.Super. 71, 80–84, 675 A.2d 314, 319–20, *appeal denied*, 546 Pa. 668, 685 A.2d 547 (1996). Once we determine that a legal duty exists, we impose liability only in those instances where the harmful consequences of the defendant's conduct could reasonably have been foreseen and prevented by the exercise of reasonable care. *Mohler v. Jeke*, 407 Pa.Super. 478, 595 A.2d 1247, 1252 (1991).

Our discussion of this issue begins with cases of this Commonwealth involving communicable diseases where both our supreme court and this Court have found physicians liable to individuals outside the physician-patient relationship. *DiMarco v. Lynch Homes—Chester County, Inc.*, 525 Pa. 558, 583 A.2d 422 (1990); *Troxel, supra*. We find the negligence analysis set forth in these cases applicable to the facts presented before us.

In *DiMarco, supra*, a hepatitis patient was advised by her physician that she could resume sexual activity in six weeks without fear of infecting her partner. The woman waited eight weeks, but her partner nevertheless contracted hepatitis. *Id.* at 560, 583

A.2d at 423. Because of the nature of the disease, the court stated that a patient must be advised to take certain precautions. The court noted that such precautions are not for the benefit of the patient; rather, precautions are for the benefit of third parties. Our supreme court, in imposing a duty on the physician to the partner, rejected the notion that the lack of a physician-patient relationship barred a third party from maintaining a cause of action against a professional in instances where the policies limiting a professional's liability "pale in comparison to the harm at issue." *Id.* at 562 n. 1, 583 A.2d at 425 n. 1. Rather:

If a third person is in that class of persons whose health is likely to be threatened by the patient, and if erroneous advice is given to that patient to the ultimate detriment of the third person, the third person has a cause of action against the physician, because the physician should recognize that the services rendered to the patient are necessary for the protection of the third person.

*Id.* at 562, 583 A.2d at 424–25. *See also Troxel, supra* (physician who treated mother and child for cytomegalovirus owed duty to third persons to inform patient about contagious nature of disease to prevent its spread to foreseeable persons, which included plaintiff, who had been exposed to virus while pregnant and, as a result, her child had died shortly after birth).

No Pennsylvania appellate court has ever addressed whether a psychiatrist owes a duty of care to a patient's family where the psychiatrist misdiagnosed the patient as having been sexually abused by a family member. However, the District Court for the Eastern District of Pennsylvania has visited this issue. In *Tuman v. Genesis Associates*, 894 F.Supp. 183 (E.D.Pa.1995), the parents of an adult child sued their daughter's therapists on a negligence theory when their daughter falsely stated that the parents had committed incest and murder, and lead a satanic cult. The court eventually dismissed the negligence claim because the parents failed to allege physical injury. *Id.* at 189. However, the court began its discussion by concluding that the therapist in this instance

owed a duty to the patient's parents. *Id.* at 188. After reviewing Pennsylvania law, the court stated that "although a plaintiff generally must show a professional relationship to maintain a claim for professional negligence, the absence of such a relationship does not necessarily bar a plaintiff's recovery where the defendant's negligence causes substantial harm to an identifiable and readily determinable class of plaintiffs." *Id.*

■ As these cases suggest, the absence of a physician-patient relationship between a plaintiff and a defendant-physician does not bar a cause of action based on negligence. Rather, in determining whether a physician owes a duty to persons outside the physician-patient relationship under a particular set of facts, a court should carefully weigh any policy considerations that might exist and limit liability to those instances where the harmful consequences of the physician's actions could reasonably have been foreseen and prevented by the exercise of reasonable care. In other words, traditional principles of negligence should be employed to determine whether a physician owes a duty outside of the physician-patient relationship.

Moreover, several cases decided in other jurisdictions recognize such a duty. We are persuaded by the reasoning of the Supreme Court of. New York in *Caryl S. v. Child & Adolescent Treatment Services, Inc.*, 161 Misc.2d 563, 614 N.Y.S.2d 661 (N.Y.Sup.Ct. 1994), *aff'd*, 238 A.D.2d 953, 661 N.Y.S.2d 168 (1997). In that case, the court held that a therapist owed a duty of care to individuals *not* considered part of the patient-therapist relationship. Following a visit with her grandparents, four-year-old Amanda told her mother, Cheryl, that Caryl, Amanda's grandmother, placed a stick in her vagina, causing it to bleed. Cheryl took Amanda to the hospital for an examination, but no physical evidence of sexual abuse was observed. Cheryl then related the incident to the police and to the Child Protection Services. Cheryl also called the Child & Adolescent Treatment Services, Inc. (CATS) regarding counseling for Amanda. *Id.* 614 N.Y.S.2d at 662.

At CATS, Amanda was principally seen by therapist Patricia Jones. Jones testified in Family Court about Amanda's alleged sexual abuse by Caryl. After interviewing Amanda's grandparents and determining that Caryl's portrayal of the events was not credible, Jones recommended to Amanda's family court guardian that she have only supervised visits with her grandmother until Caryl "exhibit[s] some responsibility for her actions and obtain[s] some counseling for whatever emotional problems she may have." *Id.* at 663. Jones was subsequently deposed in the grandparents' Family Court action to obtain visitation with Amanda, and testified at that trial. *Id.*

Caryl and her husband petitioned the court to recover for damages for injuries suffered by them as a result of Jones's acts. In their first cause of action, plaintiffs contended that Jones " 'negligently, carelessly and recklessly reached the false conclusion that ... C[aryl] sexually abused A[manda],' and thereafter negligently, carelessly and recklessly informed others of that conclusion." *Id.* at 663. The plaintiffs maintained that a duty to them resulted from "the fact that it was reasonably foreseeable that when [Jones] negligently formed an opinion that Caryl S. had sexually abused her granddaughter Amanda, and when that negligently formed opinion was negligently communicated to others, the relationship between plaintiffs and Amanda would be 'adversely affect[ed]' and plaintiffs would be harmed." *Id.* at 664.

The court began its inquiry by examining whether the defendants owed a duty to the plaintiffs. It noted that, in recent years, society had made much progress in exposing child abuse, but that, at the same time, efforts to root out child abuse had caused the suffering of many innocent parents. *Id.* at 665. The court then stated that, given the foregoing considerations:

[I]t should be readily apparent that when a professional becomes involved in a case where child sexual abuse is suspected, care must be taken in investigating and evaluating such a claim and in reaching the conclusion that such abuse did take place. Where the professional is involved in a therapeutic relationship with the child, it requires little imagination to see the harm that might result from a negligently and erroneously formed conclusion that sexual

abuse had occurred, with subsequent treatment based on that 'misdiagnosis.' In such a situation there would be no dispute that a cause of action for malpractice (or ordinary negligence) would exist on the child's behalf against the professional. . . . *Id.* at 666. The court then addressed what duty a therapist owed to those outside the therapist-patient relationship. In a situation such as the one presented before it, the court stated that:

> [A] determination must initially be made by the professional that sexual abuse in fact occurred, and this determination is made not only about the child but also about the suspected abuser. When, based upon that determination, a course of action is thereafter embarked upon by the professional, it is intended to, and necessarily does, affect both the child and his or her abuser, especially where a family relationship is involved. A suspected abuser has the right to a reasonable expectation that such a determination, touching him or her as profoundly as it will, will be carefully made and will not be reached in a negligent manner.

*Id.* The court then concluded that a therapist owed a duty to one accused, even if outside the therapy relationship, when the therapist makes the determination of sexual abuse and pursues a course of action aimed at shaping the conduct of both the alleged victim and the accused. *Id.* at 667. It further noted that such a duty was limited to specifically foreseeable parties. *Id.*

A similar case was recently decided in California. In *James W. v. Superior Court,* 17 Cal.App.4th 246, 21 Cal.Rptr.2d 169 (1993), the court concluded that California's Child Abuse and Neglect Reporting Act did not protect a therapist who was sued by the victim and her family for allegedly abusing the therapeutic relationship and falsely accusing the father of molestation. In *James W.,* eight-year-old Alicia complained of pain when she went to the bathroom one morning. Her family took her to the hospital where the staff determined that she had been raped and sodomized and filed a report pursuant to the Child Abuse and Neglect Reporting Act. Alicia stated that a man had come through her bedroom window and hurt her. However, a hospital staff member and a detective accused Alicia's father of the rape. *Id.* at 170–71.

The Department of Social Service placed Alicia in temporary foster care and referred the family to a private family counselor. At the first family session, the counselor accused the father of the abuse. For over a year and a half, however, Alicia insisted that her father was not the assailant. Both her foster parents and the counselor continuously pressured Alicia into stating that her father was the perpetrator. During this time, Alicia was completely cut off from her family despite court ordered weekly visitation because the foster parents and the counselor refused to cooperate. Eventually, coached by her foster parents and the counselor, Alicia testified against her father in court. Alicia's father was arrested and charged with raping and sodomizing Alicia. *Id.* at 171–72.

At the same time, Alicia's foster parents moved to permanently adopt her. In the interim, however, the results of forensic testing showed that Alicia's father could not have been the perpetrator. Consequently, the adoption proceedings were halted, all charges against the father were dropped, steps were taken to reunite Alicia with her family, and the court removed the counselor as Alicia's therapist. *Id.* at 172.

When Alicia's family subsequently filed a civil complaint against the counselor, the counselor argued that she had immunity under the Child Abuse and Neglect Reporting Act. The court rejected this argument stating that "[t]he Act is a reporting statute and its protection runs to reporting: it does not apply to activities that continue more than two years after the initial report of abuse by parties who are not acting as reporters." *Id.* at 174. The court concluded that the Act was satisfied when hospital staff reported the incident. *Id.*

The court further stated that its distinction between the initial reporters and those who voluntarily assume roles once the report is filed is a "healthy" one:

> It discourages family counselors and foster parents from taking on roles they are not

adequately prepared to perform. When private citizens become deeply enmeshed in investigatory or prosecutorial activities and take on functions of the police, the [Department of Social Services], county counsel or district attorney, the system suffers a loss of objectivity, independence, balance and accountability. The combination of private players and public officials all on one side performing the same roles, albeit for different reasons, has a momentum of its own which can, in its own way, overwhelm any family.

*Id.* at 176. The court also concluded that where a counselor abuses "a therapeutic relationship with family members, causing injury to the children, emotional distress to the parent, and disrupting the parent-child relationship, they breach their duties of care to the parent as well as the children and are liable to both." *Id.* at 177.

Finally, in *Montoya v. Bebensee,* 761 P.2d 285 (Colo.Ct.App.1988), the Colorado Court of Appeals reinstated a father's claim against his daughter's therapist. With no physical evidence of sexual abuse, therapist Barbara Bebensee, after two perfunctory visits with the daughter, concluded that the daughter had been sexually abused by her father. Her conclusion was contrary to both a social worker's report of the events related to her by the child, and to the determination made by a psychologist to whom Bebensee had referred the child for a second opinion. *Id.* at 286–87.

At a hearing related to father's visitation rights, Bebensee testified that there was no doubt that the father had sexually abused his daughter. However, the court appointed psychologist filed an affidavit with the court stating that he had serious concerns about Bebensee's actions, in part because "psychological testing of the child disclosed that she so confused fantasy with reality that she could report fantasy as fact and use appropriate body language in doing so." The affidavit also noted that the therapist did no psychological testing on the child; she did not investigate the reports the child made to other parties as to whether they were consistent or inconsistent with the statements made to her; she refused to speak to the

father before diagnosing him as the child abuser; she disregarded reports of other professionals; and, she advised the mother to limit visitation rights. *Id.* at 287–88.

Based on these facts, the court concluded that Bebensee owed a duty of care to the father:

> We reach this conclusion after considering both the great social utility of having therapists make reports of suspected child abuse and the significant risk of substantial injury that may occur to one who is falsely accused of being a child abuser. Certainly, the harm that may result from negligent false accusations is readily foreseeable, while the burden of care placed upon the therapists is no greater than the duty that substantially all professionals are required to meet. Thus, a mental health care provider owes a duty to any person, who is the subject of any public report or other adverse recommendation by that provider, to use due care in formulating any opinion upon which such a report or recommendation is based.

*Id.* at 288–89.

These cases illustrate that, before reaching the conclusion that a therapist owes a duty to the alleged abuser, a court must balance various policy considerations. A court must consider the great social benefit of uncovering sexual abuse and, at the same time, recognize that determinations of sexual abuse necessarily affect both the victim and the alleged abuser, and that such a determination should be carefully made and should not be reached in a negligent manner. Specifically, the courts in these cases have examined: the injury that may occur as a result of being labeled a child abuser; the concern that many therapists become too involved in legal proceedings against the alleged abuser; the devastating affect a misdiagnosis can have on the family relationships; and, the detrimental effect of a misdiagnosis on the child. After finding that a therapist owed a duty to the parents (or grandparents), the court, in each instance, concluded that the therapist failed to exercise reasonable judgment in reaching the conclusion that sexual abuse took place and, as a result, the alleged abusers suffered foreseeable harm. Thus,

these courts utilized a traditional negligence analysis in reaching the merits of each claim.

██ We find the analysis in these cases provide a workable approach in determining whether a therapist owes a duty of care to an alleged child abuser in Pennsylvania. Moreover, it is wholly consistent with the approach taken by courts in this jurisdiction in determining whether a physician owes a duty to individuals outside the physician-patient relationship in the context of communicable diseases. *DiMarco, supra; Troxel, supra.* In other words, where the policies limiting a professional's liability "pale in comparison to the harm at issue," the lack of a psychiatrist-patient relationship should not bar recovery. *DiMarco, supra.*

██ Accordingly, based on the above case law and after considering the competing policies involved, we conclude that Dr. Cohen owed a duty of care not only to Nicole but also to the Althauses, because (1) Dr. Cohen specifically treated Nicole for parental sexual abuse; (2) the Althauses were directly affected by Dr. Cohen's failure to properly diagnose and treat Nicole; (3) Dr. Cohen was both aware that criminal proceedings were initiated against the Althauses as a result of Nicole's allegations and also actively participated in them; and (4) it was reasonably foreseeable that the Althauses would be harmed by Dr. Cohen's negligent diagnosis.

The facts of this case support such a conclusion. Dr. Cohen repeatedly stated that she was not required to make any credibility determinations regarding Nicole's allegations. In doing so, she made no investigation of the reports made by Nicole to other individuals to determine whether Nicole's statements were consistent or inconsistent with the statements made to her; she completely disregarded the reports of other professionals; she never spoke to the Althauses; and she never directly challenged Nicole regarding her outlandish allegations of abuse despite the fact Dr. Cohen knew that they could not be true. Yet, at the same time, she was constantly aware of the criminal proceedings initiated against the Althauses and, in fact, was actively involved in them. On numerous occasions, Dr. Cohen testified at court proceedings on Nicole's behalf and at other times, accompanied Nicole to preliminary hearings where she heard Nicole testify against her parents to facts which she knew could not be true. She further acknowledged that she occasionally doubted Nicole's allegations and conceded at Nicole's competency hearing that Nicole at times could not distinguish fact from fantasy.

Thus, we cannot conclude that Dr. Cohen's actions were solely part of her therapeutic treatment of Nicole; rather, Dr. Cohen became deeply enmeshed in legal proceedings against the Althauses and, in doing so, placed herself in a role that extended well-beyond the therapeutic treatment context. It is clear that Dr. Cohen was not adequately prepared for such a role as she fully admitted that she never performed a diagnostic evaluation on Nicole. She never made any determination regarding Nicole's allegations and relied on the conclusion of others that Nicole had been sexually abused. However, because she chose to take on this active role, the Althauses, as alleged child abusers, had a reasonable expectation that Dr. Cohen's diagnosis of Nicole, affecting them as it did, would be carefully made and would not be reached in a negligent manner. Further, Dr. Cohen's negligent treatment of Nicole combined with her subsequent course of action against the Althauses resulted in foreseeable harm to the Althauses, as specifically identified parties.

In reaching this conclusion, we reject the approach taken by the Texas Supreme Court in *Bird v. W.C.W.*, 868 S.W.2d 767 (Tex. 1994). In *Bird*, the mother, claiming her son had reported that "daddy" had sexually abused him, sought counselling for her son. *W.C.W. v. Bird*, 840 S.W.2d 50, 51 (Tex.Ct. App.1992), *rev'd*, 868 S.W.2d 767 (Tex.1994). The therapist briefly examined the boy and interviewed the mother and her common law husband. The child told the therapist that "daddy" had abused him, but the therapist later admitted that she did not know if "daddy" was the child's biological father or his mother's common law husband. Despite her doubts, the therapist signed an affidavit stating that the child had been abused by his biological father. After further investigation, a court-appointed therapist later concluded

after lengthier interviews that the boy had not been abused by his biological father. *Id.* at 51–52.

In rejecting the claim that the therapist owed a duty to persons outside of the therapeutic relationship, the Texas Supreme Court stated that although the risk of injury from misdiagnosis is certain to occur, there is great social utility in encouraging mental health professionals to diagnose sexual abuse. *Bird v. W.C.W., supra,* at 769. We do not adopt the analysis in *Bird* because it focused on only one consideration—the utility of diagnosing sexual abuse. While we recognize that great social utility arises from allowing therapists to diagnose sexual abuse, no social utility can be derived from shielding therapists who make cavalier diagnoses that have profound detrimental effects on the lives of the accused and their family as recognized by the courts in *Caryl S., supra, James W., supra* and *Montoya, supra.* Further, as the concurring opinion in *Bird* warns, the decision "should not be read as conferring a grant of absolute immunity upon mental health professionals." *Id.* at 772 (Gammage, J., concurring, joined by Doggett, J.) Instead, the concurring opinion noted that:

> Every privilege carries with it a responsibility. If we are to grant mental health professionals the privilege of making such accusations, even if they are not called upon to make them, we also should hold them to an appropriate standard of professional responsibility.... Though we should give mental health workers in this field some latitude and protection in their efforts to eradicate child abuse, commensurate standards of professional discretion should apply, and failure to adhere to such standards could foreseeably result in their judicial recognition and enforcement.

*Id.* at 772–73. Thus, as the concurring opinion suggests, therapists should not be afforded blanket immunity in every instance.

Finally, we find that imposing such a duty on therapists requires no more than what a therapist is already bound to provide—a competent and carefully considered professional judgment. When that therapist then embarks upon a course of action directed against the accused based on that professional judgment, a therapist owes a duty of care to the accused. Here, Dr. Cohen failed to properly diagnose Nicole and, consequently, provided her with substandard treatment. Further, we conclude that Dr. Cohen's subsequent action directed at the Althauses caused harm to them that was reasonably foreseeable. Accordingly, we find that, under the particular circumstances of this case, Dr. Cohen owed a duty of care to the Althauses.

Dr. Cohen and WPIC next argue that they should be awarded a new trial on both the Althauses' and their daughter Nicole's negligence claims because the trial court erred in refusing to allow the jury to consider whether their negligence contributed to their own injuries. The standard for determining whether a jury instruction on contributory negligence is warranted is well-established.

> If there is some evidence of contributory negligence, the issue should be submitted to the jury. *McCollough [McCullough] v. Monroeville Home Ass'n, Etc.,* 270 Pa.Super. 428, 411 A.2d 794, 795 (1979). However, the burden of establishing contributory negligence rests on the defendant. *Id.* at 431, 411 A.2d at 795. Additionally, for a plaintiff's negligent conduct to effect his recovery, his conduct must be a proximate cause of his injury. *Koelle v. Philadelphia Electric Co.,* 443 Pa. 35, 42, 277 A.2d 350, 354 (1971). In order for negligent conduct to be a proximate cause of an injury it must be a substantial factual cause of the injury for which damages are sought. *Dornon v. Johnston,* 421 Pa. 58, 60, 218 A.2d 808, 809 (1966).

*Pascal v. Carter,* 436 Pa.Super. 40, 43, 647 A.2d 231, 233 (1994).

With respect to the Althauses' alleged negligence, Dr. Cohen and WPIC argue that certain decisions made by the Althauses throughout this ordeal may have "lengthened the period of time that passed before Nicole announced her refusal to testify and ultimately recanted her abuse claims." Brief for Appellant at 29. Specifically, Dr. Cohen and WPIC point to the fact that (1) the Althauses had the opportunity to meet with Nicole and CYS to discuss the charges on the day that Nicole initially made them and instead chose

to meet with their attorney; (2) Mrs. Althaus, who was given several options by CYS relating to Nicole's placement, should have opted to remove Mr. Althaus from the family home; and (3) the Althauses waited six days before attempting to meet with Nicole and over eight months before requesting a psychiatric evaluation of Nicole.

Dr. Cohen and WPIC cite several cases to support their contention that the Althauses' conduct established some evidence of negligence. *See Levine v. Rosen*, 394 Pa.Super. 178, 575 A.2d 579 (1990), *aff'd*, 532 Pa. 512, 616 A.2d 623 (1992) (jury instruction on contributory negligence in a medical malpractice action proper where evidence suggested that the patient had failed to report her symptoms to the doctor and had scheduled mammographies without the doctor's knowledge); *Morganstein v. House*, 377 Pa.Super. 512, 520, 547 A.2d 1180, 1184 (1988) (evidence in medical malpractice case of patient's failure to follow his physician's instructions was sufficient to warrant jury instruction on contributory negligence); *Berry v. J.R. Friday*, 324 Pa.Super. 499, 472 A.2d 191 (1984) (jury instruction on contributory negligence in medical malpractice action appropriate where evidence established that patient, as an overweight smoker and drinker, could have caused his heart attack). These cases address situations where there was evidence of a patient's negligence in pursuing his or her own medical treatment. In each instance, a jury instruction was appropriate because the evidence suggested that the patient's conduct could have been a "substantial factual cause" of his or her medical injury.

■ However, these cases provide no support for the contention that a jury instruction is warranted here because the Althauses had no physician-patient relationship with Dr. Cohen and had no control over her treatment of their daughter Nicole. Rather, the testimony at trial established that Nicole's undiagnosed condition progressively worsened under Dr. Cohen's treatment and that Nicole's allegations against her parents became increasingly more outlandish as a consequence. We fail to see how the Althauses' conduct could even remotely establish that,

had the Althauses chosen a different course of action, Dr. Cohen's negligent treatment of their daughter and subsequent action directed against them would have been prevented or would have lessened their injuries. Thus, because we find no evidence of causation between the Althauses' alleged contributory negligence and their injuries, the trial court did not err in refusing to instruct the jury on contributory negligence with respect to the parents' claims. *See Pascal, supra* (court erred in instructing the jury on contributory negligence where physician failed to show that minor and his father were contributorily negligent in failing to seek treatment earlier because there was no evidence presented that a proper diagnosis could have been made at an earlier date).

■ With respect to Nicole's alleged contributory negligence, Dr. Cohen and WPIC point to the fact that "but for" Nicole's allegations against her parents, there would be no lawsuit. However, Dr. Cohen and WPIC would have us ignore the fact that Nicole had a borderline personality disorder that Dr. Cohen negligently failed to diagnose and, consequently, provided Nicole with substandard treatment that further contributed to Nicole's inability to distinguish fact from fantasy. As the trial court noted, "[i]t is precisely because Nicole was psychologically unstable that her representations *to her treating therapist* cannot be seen as contributory negligence." Opinion, McLean, J., May 22, 1996, at 10. Because Dr. Cohen and WPIC cite no case law from this Commonwealth that would support a jury instruction on contributory negligence in such an instance, we find no error in the trial court's refusal to submit such an instruction to the jury.

■ We now address the Althauses' claims in their cross-appeal. Our review of the Althauses' brief with respect to their first and second issues reveals that these claims are not supported by any legal authority; rather, we find a reiteration of the notes of testimony from trial and mere factual allegations. Pa.R.A.P. 2119. When a party has failed to cite any pertinent authority in support of a contention, the claim is waived. *Fred E. Young, Inc. v. Brush Mountain*, 697

A.2d 984, 990 (Pa.Super.1997), *appeal denied,* —— Pa. ——, —— A.2d —— (1998). Accordingly, we find the Althauses' first and second issues to be waived.

■ In their third issue on appeal, the Althauses argue that the court erred in failing to instruct the jury on punitive damages.

[T]he purpose of punitive damages is to punish outrageous and egregious conduct done in a reckless disregard of another's rights; it serves a deterrence as well as a punishment function. *Schecter v. Watkins,* 395 Pa.Super. 363, 383–84, 577 A.2d 585, 595 (1990). Therefore, under the law of this Commonwealth, a court may award punitive damages only if an actor's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others. *SHV Coal, Inc. v. Continental Grain Co.,* 526 Pa. 489, 494, 587 A.2d 702, 704 (1991); *Rizzo v. Haines,* 520 Pa. 484, 555 A.2d 58 (1989).

*Johnson v. Hyundai Motor America,* 698 A.2d 631, 639 (Pa.Super.1997), *appeal denied,* —— Pa. ——, 712 A.2d 286 (1998). Here, we agree with the trial court that while Dr. Cohen's actions amounted to professional negligence, there was not sufficient evidence of "outrageous conduct" to justify instructing the jury on punitive damages. Accordingly, the court properly denied the Althauses' request.

■ In their final issue for review, the Althauses maintain that delay damages should be awarded to their daughter Nicole pursuant to Pa.R.C.P. 238. However, Rule 238 is only applicable in civil actions where a party is "seeking monetary relief for bodily injury, death or property damage." *See Hodges v. Rodriguez,* 435 Pa.Super. 360, 377–79, 645 A.2d 1340, 1349–50 (1994) (collecting cases of non-applicability); *compare Temporaries, Inc. v. Krane,* 325 Pa.Super. 103, 115, 472 A.2d 668, 674 (1984) (tortious interference with contact; Rule 238 applies only to certain actions and does not encompass every action). We decline to extend Rule 238 to actions where a party is seeking relief for mental illness and therefore find this claim to be without merit.

Based on the foregoing, we **AFFIRM** the judgment in all respects.

McEWEN, President Judge, files a Concurring and Dissenting Statement, in which he joins the majority's decision with respect to the duty of care owed by Dr. Cohen to the Althauses, but dissents with respect to the majority decision's disposition of the Althauses' cross-appeal.

TAMILIA, J., files a Concurring and Dissenting Opinion, in which he dissents from the majority's disposition of the duty of care owed by Dr. Cohen to the Althauses, but joins the majority's decision with respect to the Althauses' cross-appeal. EAKIN, J., joins.

SCHILLER, J., files a Dissenting Opinion, in which he dissents from the majority's disposition of the duty of care owed by Dr. Cohen to the Althauses. BECK and EAKIN, JJ., join.

McEWEN, President Judge, concurring and dissenting:

I rush to join the well-reasoned Opinion of the majority, for I agree that Dr. Cohen owed a duty of care to both Nicole and to her parents. I must, however, dissent from the disposition by the majority of the Althauses' cross-appeal.

First, I am of the view that, under the circumstances if this case, it was error to refuse to submit the issue of punitive damages to the jury. Punitive damages may be awarded based upon a defendant's reckless indifference to the rights of others. The record created over the course of this three-week trial contains evidence of outrageous behavior by Dr. Cohen, which if accepted as true by the jury, was more than sufficient to support an award of punitive damages. Specifically, Dr. Cohen, who had objected to the proposed independent psychiatric examination of Nicole, testified, as the majority states, to matters of abuse despite her knowledge that portions of the oral testimony of Nicole herself were false and untrue. *See, e.g.: SHV Coal v. Continental Grain Corp.,* 526 Pa. 489, 493–95, 587 A.2d 702, 704 (1991); *Bannar v. Miller,* 701 A.2d 232, 242 (Pa.Super. 1997); *Takes v. Metropolitan Edison*

*Corp.*, 440 Pa.Super. 101, 116–18, 655 A.2d 138, 146 (1995), *rev'd on other grounds*, 548 Pa. 92, 695 A.2d 397 (1997). Thus, I would find that it was error to refuse to submit the issue of punitive damages.

Moreover, I am unable to agree[1] that where a party "has failed to cite any authority in support of a contention, the claim is waived." However, while I would reach th merits of the first two issues presented in the Althauses' appeal which the majority deems waived, I, nonetheless, concur in the disposition of the majority since I would find:

> That appellants have not demonstrated that the trial court erred when it concluded that the good faith immunity provisions of the child protective services law, 23 P.C.S. § 6318, precluded the Althauses from using Dr. Cohen's testimony from the various legal proceedings for the purpose of supporting their allegations of negligence, and

> That appellants have not demonstrated that the trial court erred when it precluded the Althauses from submitting testimony relating to the results of Mr. Althaus's lie detector test and to the fact that Dr. Cohen was aware that he had passed it, for surely the trial court in its discretion could properly conclude that the prejudicial effect of evidence of the lie detector test outweighed its probative value.

TAMILIA, Judge, concurring and dissenting:

While I join that portion of the majority Opinion which denies relief to the Althauses in their cross-appeal, I respectfully dissent to the determination Dr. Judith Cohen and the University of Pittsburgh Western Psychiatric Institute and Clinic (WPIC) owed a duty of care to the Althauses.[1]

Nicole, a minor at the time of trial, was born on April 10, 1975 to appellees Richard and Renee Althaus (the Althauses). In 1990, Nicole's mother was diagnosed with skin and breast cancer, which was treated with surgery and chemotherapy. Shortly thereafter, Nicole's paternal grandmother was diagnosed with pancreatic cancer, from which she soon died. "In this atmosphere of stress and uncertainty, Nicole's emotional and psychological well-being began to deteriorate." (Slip Op., McLean, J., 5/22/96, p. 2.) During this period, Nicole began spending a great deal of time, both in and out of school, with one of her teachers, Priscilla Zappa. In an effort to obtain information and emotional support for Nicole, Mrs. Zappa and Nicole phoned a cancer support hotline and spoke to a woman named Connie Lappa. After talking to Mrs. Lappa several times, Nicole mentioned that her father, Richard Althaus, had subjected her to inappropriate touching. Mrs. Lappa reported this information to Allegheny County's Children and Youth Services (CYS), as she was required to do by 23 Pa.C.S. § 6311, **Persons required to report suspected child abuse.**

The matter rapidly acquired a momentum all its own. CYS removed Nicole from her parents' custody and placed her in the care of Mrs. Zappa. Following an evaluation at Children's Hospital, Nicole was referred to the Child and Adolescent Sex Abuse Clinic of the Western Pennsylvania Psychiatric Institute (WPIC). Nicole also had a physical examination at Children's [Hospital], during which Dr. Mary Carrasco found no evidence of sexual activity or sexual abuse. However, Dr. Carrasco noted that sexual abuse cannot be ruled out based on a lack of physical evidence. Nicole's therapist at WPIC was Dr. Judith Cohen, whom she saw at least

---

1. Rule 2119(a) provides, in pertinent part, that the argument portion of the brief "shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type . . .—the particular point treated therein, **followed by such discussion and citation of authorities as are deemed pertinent.**" Pa.R.A.P. 2119(a)(emphasis supplied). The case cited by the majority as support for the finding of waiver, in turn, rely upon *Bunt v. Pension Mortgage Associates, Inc.*, 446 Pa.Super. 359, 666 A.2d 1091 (1995), wherein the Court held: "Ar-

guments that are not **appropriately** developed are waived." *Id.* at 368, 666 A.2d at 1095 *quoting Gallagher v. Sheridan*, 445 Pa.Super. 266, 270, 665 A.2d 485, 487 (1995), *allo. denied*, 544 Pa. 631, 675 A.2d 1249 (1996)(emphasis in original).

1. For purposes of clarity, Dr. Cohen and WPIC will be referred to as appellants and the Althauses, parents and child, referred to as appellees throughout this Opinion.

once a week. Dr. Cohen performed no independent diagnostic studies on Nicole, instead taking at face value the indicated abuse report filed by CYS.

Over time[,] Nicole's allegations of sexual abuse grew to include her mother and another couple whom the Althauses had never met. The charges themselves became progressively more outlandish, including not only sexual abuse[,] but ritualistic torture and the murder of several babies which Nicole claimed to have had via caesarian section. Despite many apparent inconsistencies in Nicole's stories, her credibility was never challenged by Dr. Cohen. Dr. Cohen also refused input from any other member of the Althaus family[,] as well as from Dr. Alan Axelson, a child psychiatrist retained by the Althauses to help them elucidate the matter, and from Hilda Schorr–Ribera, Ph.D., Renee's cancer support therapist.

As a result of Nicole's allegations[,] Richard Althaus was arrested three times and Renee [was arrested] twice. Dr. Cohen accompanied Nicole to several criminal hearings and also appeared in Juvenile Court to argue on behalf of Nicole's continued placement with Mrs. Zappa. When the criminal case against Richard and Renee Althaus came before the Honorable Robert Dauer, the Judge ordered, over Dr. Cohen's objection, an independent psychiatric examination of Nicole to determine her competence to testify. This examination was performed by Dr. Marshall Schecter of the University of Pennsylvania, who concluded that Nicole suffered from a borderline personality disorder, and was unable to distinguish fact from fantasy.

(Slip Op. at 2–3.)

Thereafter, Nicole was found incompetent to testify and the Commonwealth withdrew the criminal charges filed against the Althauses. For the first time in fourteen (14) months, the Althauses were permitted to speak to their daughter. Nicole recanted her allegations of sexual abuse and returned home to live with her parents. This medical malpractice action was initiated by Nicole and her parents against appellants, Dr. Cohen and WPIC, on the theory that these mental health professionals negligently misdiagnosed, and then exacerbated, Nicole's delicate borderline personality disorder. The case was submitted to a jury, which returned separate verdicts in favor of Nicole and her parents. Post-trial motions were filed and denied.

Dr. Cohen and WPIC, appellants, do not challenge the jury verdict rendered in favor of Nicole, but rather contend they are not liable to her parents for the harm which flowed from such negligence claiming they owed no duty to the non-patient parents. Appellants also claim they are entitled to a new trial based on the trial court's refusal to allow the jury to consider whether the Althauses, and/or Nicole, were contributorily negligent in this case.

It is well settled that in order to establish a *prima facie* case of medical malpractice, a plaintiff must establish (1) a duty owed by the physician to the patient; (2) a breach of duty from the physician to the patient; (3) that the breach of duty was a proximate cause of or a substantial factor in the harm suffered by the patient; and (4) damages suffered by the patient that were a direct result of that harm. *Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888 (1990). As a general rule, however, a physician owes no duty of care to persons outside the physician-patient relationship. *Troxel v. A.I. Dupont Institute,* 450 Pa.Super. 71, 675 A.2d 314 (1996). In recent years, however, our courts have carved out a narrow exception to this rule and have found a physician/doctor owes a duty to third persons "where the physician undertakes the treatment of a patient with a communicable or contagious disease." *Id.* at 88, 675 A.2d at 322. *See also DiMarco v. Lynch Homes–Chester County, Inc.,* 525 Pa. 558, 583 A.2d 422 (1990) (physician found liable to third party for providing incorrect information as to the period in which a person could contract hepatitis-B from patient).

The trial court, here, has now attempted to expand this exception to the general rule to instances where a psychiatrist negligently treats a child who has charged her parents with child and sexual abuse and the doctor thereafter is sued by the parents, who were charged criminally. Specifically, the trial

court, relying on *DiMarco*, found that "a treating psychiatrist has a duty of care toward those whose resultant harm is reasonably foreseeable." (Slip Op. at 5.) The trial court also relied on *Tuman v. Genesis Associates*, 894 F.Supp. 183 (E.D.Pa.1995), which found that parents had standing to sue their daughter's therapist after the daughter, during therapy, made a string of unsubstantiated allegations of ritual abuse. The *Tuman* court determined the parents had standing to sue because the following four factors were met:

1) The therapist specifically undertook to treat the child for the parents;

2) The parents relied upon the therapist;

3) The therapist was aware of the parents' reliance; and

4) It was reasonably foreseeable that the parents would be harmed by the therapists' conduct.

(Slip Op. at 6.) Applying these four factors, the trial court determined the forseeability theory in *DiMarco* applies to the present case. Specifically, the court determined

> Whereas Mr. and Mrs. Tuman sought therapy on behalf of their adult daughter, Dr. Cohen was retained as Nicole's therapist by the Juvenile Court and Children and Youth Services acting in loco parentis. Mr. and Mrs. Althaus were effectively barred by the pendency of the Juvenile Court proceedings from choosing their own doctor for Nicole. It is also worthwhile to note that preserving family unity wherever possible is a stated goal of proceedings involving dependent children under the Juvenile Act, 42 Pa.C.S.A. § 6310 *et seq.*, and to this extent Mr. and Mrs. Althaus as well as Nicole were foreseeable beneficiaries of Dr. Cohen's treatment.

(Slip Op. at 6–7.) Finally, the trial court, addressing the "specific undertaking" component of the *Tuman* test, distinguished this Court's analysis in *Heil v. Brown*, 443 Pa.Super. 502, 662 A.2d 669 (1995), from the present case. In *Heil*, a psychiatric patient, who was discharged from a hospital despite evident signs of psychosis, subsequently suffered a psychotic episode while operating his vehicle, causing him to hit another car. This Court held the hospital owed no duty of care

to the victim because he was not readily identifiable as a victim of harm resulting from the negligent treatment of the patient. The trial court here, however, found the Althauses, unlike the victim in *Heil*, clearly were "within the ambit of harm created by Nicole's negligent treatment." (Slip Op. at 7.)

I would find the trial court erred in its analysis and decision regarding this issue and, therefore, would reverse the court's determination and correspondingly remand the matter for entry of judgment in favor of the appellants. My review of the relevant caselaw cited by the parties, the trial court and the majority leads me to believe that no duty of care existed on behalf of appellants, Dr. Cohen and WPIC, as to the parents.

In discussing the general concept of duty, the Pennsylvania Supreme Court has made it clear that whether a particular defendant owes a duty of care to a particular plaintiff is dependent on "many factors".

> In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than "the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection" from the harm suffered. *Leong v. Takasaki*, 55 Haw. 398, 520 P.2d 758, 764 (1974). To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times. The late Dean Prosser expressed this view as follows:

> These are shifting sands, and no fit foundation. There is a duty if the court says there is a duty; the law, like the Constitution, is what we make it. Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question. When we find a duty, breach and damage, everything has been said. The word serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none. In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals

and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, 'always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.'

*Gardner by Gardner v. Consolidated Rail Corp.*, 524 Pa. 445, 454–55, 573 A.2d 1016, 1020 (1990), *quoting Sinn v. Burd,* 486 Pa. 146, 164, 404 A.2d 672, 681 (1979).

Initially, unlike the majority, I find the recent decision of the Supreme Court of Texas in *Bird v. W.C.W.,* 868 S.W.2d 767 (Tex. 1994), to be persuasive in reaching my decision. In *Bird,* a young boy indicated that his father, who was divorced from his mother, had sexually assaulted him. The boy's mother reported the claim to Child Protective Services and a criminal investigation of the father ensued. Criminal charges subsequently were filed, and the boy's mother sought to terminate the father's parental rights to the child based on the allegations of sexual abuse.

Eventually, the criminal charges against the father were dismissed and he retained custody of the child. The father subsequently filed suit against the child's psychologist and the clinic employing him, alleging that they were liable to father for medical malpractice because the psychologist had misdiagnosed the boy as having been sexually abused. Summary judgment was granted in favor of the psychologist and the clinic because the trial court found that no professional duty was owed to the father.

Affirming, the Texas Supreme Court held that a mental health professional who negligently misdiagnoses a child as having been sexually abused does not owe a duty of care to that child's parents despite the fact that they may suffer false accusations and adverse legal consequences. Specifically, the Court found that "as a matter of law there is no professional duty running from a psychologist to a third party to not negligently misdiagnose a condition of a patient." *Id.* at 768. The Court then went on to address the foreseeability factor, stating:

We acknowledge that the harm to a parent accused of sexual abuse is foreseeable. However, foreseeability alone is not a sufficient basis for creating a new duty. Psychology is an inexact science. There is an inherent risk that someone might be falsely accused of sexually abusing a child; in such cases, injury is almost certain to result. The magnitude of the burden of guarding against the injury is also uncertain. While mental health professionals may be able to conduct tests to determine whether there is indicia of sexual abuse, the quality of information they can acquire is limited. The child is often the main source of the information, and young children can have difficulty communicating abuse of that nature. Thus, while the risk of injury to an accused parent is real, it is only part of the equation. Furthermore, the risk of an erroneous determination of abuse is ameliorated, in part, by the availability of criminal sanctions against a person who knowingly reports false information in a custody proceeding.

*Id.* at 796 (citations omitted).

The present case is much like the *Bird* case and I believe the rationale used to reach its conclusion is equally applicable to the Althauses' claim. Pennsylvania, like Texas, has expressed its concern and outrage over child sexual abuse through its enactment of the Child Protection Services Law, 23 Pa. C.S. § 6301 *et seq.* Specifically, the statute reads "[a]bused children are in urgent need of an effective child protective service to prevent them from suffering further injury and impairment." *Id.* at § 6302(a). Clearly, any decision by this Court, which would impose a duty of care on a psychiatrist to the parents of a child patient, who alleges abuse by the parents, must consider the painful and troubling reality of child sexual abuse in the United States. Such an imposed duty would have a chilling effect on the treatment of these children, particularly if therapists become reluctant to treat victims of sexual abuse for fear of malpractice claims by the accused.

The process which evolved from the first allegation of sexual abuse here took on the attributes of the Salem Witch-hunt and other

hysterical manifestations in medieval Europe which resulted in persons charged being burned at the stake.[2] Beginning with a deeply disturbed child, the rescue syndrome came into operation from virtually all parties who came in contact with Nicole in the child protective services, including the district attorney's office.[3] Unfortunately, instead of dealing with the incredible aspects of the child's allegations and instead of looking to a fundamental mental disturbance which required evaluation and treatment, the assumption was made that there was an underlying sexual abuse pattern which needed resolution to resolve the delusional behavior. The flaw in the process which permitted a misapplication of treatment is the fear that by treating the victim as a mental problem rather than an abused person, the underlying concern that the victim is being blamed for wrong and becomes twice victimized would be realized. This was frequently the approach in pre-twentieth century treatment of children, which is assiduously avoided in modern times. Also, it is not unlikely that as the support of the victim from all sources becomes solidified, the need to reinforce that support becomes an essential element in the victim's feeling of self-esteem resulting in her enlargement of alleged abuse and expansion of the numbers of accused persons.[4] It is not inconceivable that actual abuse did occur, which in the process described above was exacerbated into catastrophic proportions.

I find little merit in the trial court's claim the parents were foreseeable victims of Dr. Cohen's negligent treatment of Nicole and thus she owed a duty of care to them. Parents are invariably effected by traumatic things that happen to their children and thus, in a generic sense, are foreseeable victims. As previously noted, while foreseeability is one factor to consider in determining whether there is a duty, many factors interplay. Clearly, the harm to the parents arose out of the false criminal charges brought by the Commonwealth of Pennsylvania, not the misdiagnosis by Dr. Cohen. It is in this respect that I would find the trial court's reliance upon *Tuman, supra,* and *DiMarco, supra,* misplaced.

The fact that Nicole, after independent evaluation by a psychiatrist, was diagnosed as having a borderline personality disorder[5] and was unable to distinguish fact from fantasy, thereby being incompetent to testify, did not eliminate the possibility that she suffered from sexual abuse, albeit not to the aggravated and incredible degree she related. It might be argued that the district attorney's office, bolstered by the pressure from county and state agencies and the media, acted precipitously in filing charges without requiring a more definitive evaluation of the child's mental conditions before rather than after prosecution.

In *Tuman,* which I note is not binding on this Court, the Federal District Court granted the mental health counselor's motion to dismiss, but went on to predict the Pennsylvania Supreme Court would impose a duty of care upon the counselors under the circumstances of the present case. The court, however, limited its Opinion as to duty only to those cases where a counselor is accused of implanting false memories with its patient. *See Tuman, supra* at 189 n. 11. Here, the parents do not allege Dr. Cohen implanted Nicole with false memories that her parents abused her, and therefore I find *Tuman* inapplicable. It is of critical significance that the allegations of abuse emanated from the child and not the psychiatrist, and were artic-

---

**2.** *See* The Emotionally Disturbed Child—Then and Now, J. Louise Despert, M.D. (1965), pp. 67, 82.

**3.** Despite Nicole's impossible allegations of multiple pregnancies, caesarian deliveries and murdered embryos, she was found sufficiently credible as to the underlying sexual abuse charges, independent of any diagnosis of Dr. Cohen, for CYS, Children's Hospital and Juvenile Court to sustain the finding of abuse and removal of Nicole from her home and placement in foster care. The Juvenile Court, in particular, could have

ended the matter in several ways, but chose to proceed with the treatment offered by appellants.

**4.** *See* American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition. Washington, DC, American Psychiatric Association, 1994. "**Borderline Personality Disorder** is a pattern of instability in interpersonal relationships, self-image, and affects, and marked impulsivity." *Id.* at 629.

**5.** *Id.*

ulated before Dr. Cohen entered into the course of treatment.

Secondly, *DiMarco, supra,* a 4–3 decision by our Supreme Court which relied upon the Restatement (Second) of Torts § 324A, **Liability to Third Person for Negligent Performance of Undertaking,** as the basis for liability, as well as *Troxel, supra,* which is relied upon by appellees in their supplemental brief, involved issues of communicable diseases. Specifically, the physicians provided erroneous information regarding the transmission of communicable diseases and the patients and third parties justifiably relied on that advice to their detriment. In these cases, "the court recognized a duty owed by the physician based upon the important role of the medical community in preventing the spread of communicable diseases, a duty that extends to all those within the foreseeable orbit of risk of harm." *Troxel, supra* at 84, 675 A.2d at 320. Clearly, a duty of care exists for a physician treating a patient with a communicable disease, whose health already has been compromised, to prevent the spread of the disease to third parties as a matter of primary importance. In fact, physicians are the first line of defense against the spread of communicable diseases and should recognize the services rendered to the patient are necessary and vital for the protection of third parties. *DiMarco, supra* at 560–64, 583 A.2d at 424–25. More importantly, considering the public policy aspects of communicable disease cases, I note there is little social utility in failing to warn patients about known side-effects of drugs or the dangers of a communicable disease, "but there is great social utility in encouraging mental health professionals to assist in the examination and diagnosis of sexual abuse." *Bird, supra* at 770. In fact, this Court, in *Crosby by Crosby v. Sultz,* 405 Pa.Super. 527, 592 A.2d 1337 (1991), refused to apply the rationale in *DiMarco* where a third party injured in an automobile accident involving a diabetic patient sued the patient's doctor for failing to report the patient's condition to the Department of Transportation. Finding no duty of care existed, this Court stated, "we can find no logical connection" between the obligation to disclose the patient's condition and the third party's injuries. *Id.* at 543, 592

A.2d at 1345. The Court then added, "[w]e note here that diabetes is not a communicable disease such as hepatitis." *Id.* at 544, 592 A.2d at 1346. Clearly, the alleged obligation in *Crosby* is more akin to the present case than the duty of care imposed in *DiMarco.* The treatment of child abuse and sexual abuse in our society is fragmented, surrounded by confidentiality, anonymity and circumscribed by the rules, regulations and ethical mandates imposed on all participants in the process and involving all segments of the child service delivery system. *See* The Child Protective Services Law, 23 Pa.C.S. § 6301 *et seq.* This undertaking, which also implicates psychiatric and other forms of counseling within its parameters, is so much more complex than dealing with the effects of a communicable disease or failing to hold and/or treat a dangerous psychiatric patient who has identified targets for his violence, that liability cannot be asserted in the fashion under review here.

As the majority clearly delineated in its statement of the facts as elicited from Dr. Cohen, hers was not a forensic role leading to a determination as to whether sexual abuse had or had not occurred but, rather, she relied upon the findings of others as to the occurrence of abuse and proceeded to treat the resulting conditions of mental disorders which presented themselves to her as the treatment person. The majority then assesses liability upon Dr. Cohen for the actions of the justice system in prosecuting Nicole's parents because she failed in some manner to prevent their prosecution for matters and allegations which she, as well as others involved, knew to be untrue. Finally, the majority holds Dr. Cohen liable of negligent treatment for the increasingly bizarre allegations made by Nicole which resulted in their prosecution.

The majority proceeds on two theories of liability. First, that Dr. Cohen failed to properly diagnose and treat Nicole's condition, and second, that her negligent treatment produced the conditions resulting in the prosecution of the parents.

Under the first theory, I believe the negligent diagnosis and/or treatment cannot be

the basis for liability of Dr. Cohen as to the parents for reasons discussed below which relate to a proper nexus. As to the second theory, the prosecution of the parents was a legal process independent of the diagnosis and treatment by Dr. Cohen, and is more related to the actions of CYS and District Attorney's Office than Dr. Cohen.

The majority does concede that the treating psychiatrist does not owe an absolute duty of care to the parents of a child for negligent psychiatric treatment of that child. (Op., at p. 1151.) Where the majority assesses liability to Dr. Cohen is in attending and "actively participat[ing] in the criminal proceedings against the Althauses." *Id.* According to the majority, the active participation consisted of "attend[ing] several preliminary hearings at Nicole's request and remain[ing] passive as Nicole made outlandish allegations against her parents . . . nonetheless allow[ing] Nicole to testify to these allegations and, in doing so, essentially validat[ing] Nicole's unwittingly false testimony." *Id.* Accordingly, the majority finds Dr. Cohen's actions extended well beyond the psychiatric treatment of Nicole and concludes Dr. Cohen owed a duty of care to the Althauses and that the lack of a psychiatric-patient relationship did not provide blanket immunity to Dr. Cohen. *Id.*

The rationale of the majority is illogical and unsupportable. At the outset, the behavior of Dr. Cohen, in attending the hearing at Nicole's request, may not be construed in any fashion to be a breach of any duty owed to the parents. She was Nicole's doctor and was required to do anything within reason to support her patient and to make her ordeal in participating in legal proceedings less traumatic. It is common practice for treating persons to accompany their patients or clients to such hearings for emotional support, which is within the ambit of the therapeutic relationship. The majority then takes another huge step into causation by attributing liability for harm to the parents by remaining "passive" and "allowing" Nicole to testify and thereby "validating" Nicole's "unwilling false" statements. I believe this assessment of liability far exceeds any legal basis established in our law and places in jeopardy any treatment person who attends a probable cause hearing with their patient. Either they must remain silent and suffer the possibility of later negligence as to the party charged, should the charges prove to be false, or breach their duty to their patient and "volunteer" their opinion of the irrationality or falsity of the charges, subjecting themselves to malpractice or other charges. Any immunities they have heretofore been granted by the law as privilege will be stripped away.

### § 5944. Confidential communications to psychiatrists or licensed psychologists

No psychiatrist or person who has been licensed under the act of March 28, 1972 (P.L. 136, No. 52), to practice psychology shall be, without the written consent of his client, examined in any civil or criminal matter as to any information acquired in the course of his professional services in behalf of such client. The confidential relations and communications between a psychologist or psychiatrist and his client shall be on the same basis as those provided or prescribed by law between an attorney and client.

42 Pa.C.S. § 5944. A psychiatric patient's right to privacy prohibits subpoena of records or testimony of a psychiatrist regarding treatment of his patient without the written consent of the patient. *In re B.,* 482 Pa. 471, 394 A.2d 419 (1978). Dr. Cohen's presence at the hearings was supportive of Nicole and not in the role of a forensic expert for or against the parents. If this is so, the majority's attempt to delineate an exception to the rule that the child's psychiatrist owes no duty to the parent has not been established.

What is more to the point, the majority acknowledges the allegations of Nicole are bizarre, patently untrue and "unwittingly" made by her. Under these circumstances, then, it did not require Dr. Cohen to express any view as to Nicole's credibility or lack of it when the charges were presented, and those in charge of the conduct of the legal proceedings should have taken steps to withhold prosecution for lack of a *prima facie* case. The credibility determinations must be made by the fact-finder who may not substitute the

opinion of the therapist for that determination. To focus all of the responsibility on Dr. Cohen for her passivity and silence, in the face of absolute irrationality of Nicole's allegation, is incongruous.

The majority goes to great length to establish that a treatment person can be responsible for harm to third parties as a result of misdiagnosis of sexual abuse in the absence of physical evidence or from statements of the child. *Caryl S. v. Child & Adolescent Treatment Services, Inc.,* 161 Misc.2d 563, 614 N.Y.S.2d 661 (N.Y.Sup.Ct. 1994) (therapist recommended visitation with grandmother be curtailed until she acknowledge responsibility for her actions in abusing the grandchild, in the absence of abuse); *James W. v. Superior Court,* 17 Cal.App.4th 246, 21 Cal.Rptr.2d 169 (1993) (hospital staff member accused father of rape although child reported rape and sodomy caused by a stranger who came through her bedroom window; subsequent forensic evidence proved father not guilty); and *Montoya v. Bebensee,* 761 P.2d 285 (Colo.Ct.App.1988) (therapist concluded child was sexually abused by her father contrary to physical evidence and in conflict with social worker's report of the events related by the child and psychologist's determination).

These cases are not on point because in each of them the therapist took affirmative and convincing action to assess the parent or grandparent involvement and to produce the resulting harm of which was complained. Here, Dr. Cohen remained in the treatment role, did not precipitate or induce the action against the parents and did not cross the line into the accusatory or prosecutorial role. At best, she did not share her views with the parents and did not intervene in the prosecutorial process when Nicole was called to testify. This case is clearly distinguishable from those cited by the majority.

In that I do not believe appellants owed a duty of care to the Althauses, I find no need to address their claim the parents were contributorily negligent. Appellants, however, also allege the trial court erred in not instructing the jury that they could consider the contributory negligence of Nicole. "[I]f there is some evidence of contributory negligence, the issue should be submitted to the jury." *Pascal v. Carter,* 436 Pa.Super. 40, 647 A.2d 231 (1994). Here, however, the trial court determined Nicole did not act intentionally, there was no evidence to support such a claim and she was unaware of the true nature of her actions. The trial court held, as a matter of law, Nicole could not have been contributorily negligent in failing to do what she was incapable of doing.

It is clear that at the time of these events Nicole Althaus was a seriously disturbed young woman who actively misrepresented the facts to Dr. Cohen among many others, who avoided all contact with her parents and who desired to remain with the Zappa family. It is precisely because Nicole was psychologically unstable that her representations *to her treating therapist* cannot be seen as contributory negligence. The very nature of the relationship belies Defendants' implication that they were entitled to take Nicole's statements at face value.

(Slip Op. at 10.) I am not prepared to support that finding of the trial judge as it sweeps too broadly and establishes a principle of law not established by Pennsylvania appellate courts.[6] If the ruling of the majori-

---

**6.** The representations by Nicole of abuse reached many persons, *including* her treating therapist, which could bear on whether she was contributorily negligent in leading to a misdiagnosis. The therapist was asked to treat sexual abuse and, at least initially, that charge had to be considered at face value considering the surrounding circumstances. While the trial court found Nicole mentally incompetent and not responsible for her actions, in many ways those actions appeared to be rational and her behavior as a student and foster child were well within reasonable, if not normal, limits. Mental illness or disturbance in and of itself does not disqualify a person as a witness or defendant. The appellants in their brief cite several cases on reargument from other jurisdictions (none in Pennsylvania) that support their theory that a contributory negligence claim should have been allowed. *See Rogers v. Baptist General Convention,* 651 P.2d 672 (Okla.1982); *DeMartini v. Alexander Sanitarium, Inc.,* 192 Cal. App.2d 442, 13 Cal.Rptr. 564, 91 ALR2d 383 (1961); *Macon–Bibb County Hospital Authority v. Appleton,* 123 Ga.App. 445, 181 S.E.2d 522 (1971).

ty is the law of Pennsylvania, then I believe there is room to admit a contributory negligence defense. However, in light of appellants' withdrawal of their challenge to a finding of malpractice as to Nicole, I see no need to reach that issue.

Accordingly, I believe the trial court erred by imposing a duty of care upon Dr. Cohen and WPIC as to Nicole's parents. Considering the various public policy limitations and the fact the parents' alleged harm ultimately resulted from the criminal charges, propounded by other persons and agencies rather than appellants' diagnosis, and not primarily a result of Dr. Cohen's misdiagnosis, I would refuse to extend the duty of care in a physician/non-patient relationship to the parents of a child who was incorrectly diagnosed as being a victim of sexual abuse. In all other respects, I would affirm the decision of the trial court.

EAKIN, J., joins.

SCHILLER, Judge, dissenting:

Although I can agree with the proposed disposition of the subsidiary issues in this case, as to the principle issue upon which *en banc* consideration was granted, I am compelled to dissent.

We are asked to decide whether a psychiatrist's duty of care should be extended beyond the physician-patient relationship to the parents of the child. In my view the answer must be unambiguous: the parents have no independent right to recover damages in a malpractice claim for negligent treatment of the child. Considerations of public policy and sound jurisprudence demand no less.

The battle against the sexual abuse of children is fought on many fronts. Child psychiatrists are often in the vanguard of that fight, and they must be free to treat young patients unencumbered by extraneous fears. Expanding the legal liability of psychiatrists beyond the patient will diffuse their commitment to the child, deter professional candor, and constrain the search for truth. In a field fraught with complexity and scientific uncertainty, the law should be clearly defined to enable psychiatrists to function with confidence and competence. When one among them fails to meet the medical standard of care to his patient, the psychiatrist can be held legally accountable. To expand that duty to *any* third party will merely invite unnecessary litigation while inhibiting the diagnosis, treatment and, perhaps even the reporting of child sexual abuse.[1]

The decision of the majority places the law of Pennsylvania on the proverbial slippery slope, a precipitous one at that. Are parents the only foreseeable victims of medical malpractice by a psychiatrist treating a sexually abused child? Clearly not. The class of potential victims is limited only by the child's imagination and the professional's willingness to suspend disbelief. Why would a grandparent's case be any less compelling than that of Nicole's parents? *See Caryl S. v.*

As to her competence in this regard, Strong, John William, *McCormick on Evidence* (4th ed.1992), provides guidance as follows:

**Chapter 7. The Competency of Witnesses**

**§ 62. Mental Incapacity and Immaturity: Oath or Affirmation**

There is no rule which excludes an insane person as such, or a child of any specified age, from testifying, but in each case the traditional test is whether the witness has intelligence enough to make it worthwhile to hear him at all and whether he feels a duty to tell the truth. Is his capacity to perceive, record, recollect, and narrate, such that he can probably bring added knowledge of the facts? The major reason for disqualification of the persons mentioned in this section to take the stand is the judges' distrust of a jury's ability to assay the words of a small child or of a deranged person. Conceding the jury's deficiencies, the remedy of excluding such a witness, who may be the only person available who knows the facts, seems inept and primitive. Though the tribunal is unskilled, and the testimony difficult to weigh, it is still better to let the evidence come in for what it is worth, with cautionary instructions.

Revised Uniform Rule of Evidence 601 and the first sentence of Federal Rule of Evidence 601 reflect the above and additional reasoning by providing every person is competent to be a witness unless "otherwise provided" in the rules.

*Id.,* (footnotes omitted).

1. This is not to say that parents might not have other independent causes of action, such as defamation or intentional infliction of emotional distress, based on action taken beyond the scope of the medical diagnosis and treatment.

*Child & Adolescent Treatment Services, Inc.,* 161 Misc.2d 563, 614 N.Y.S.2d 661 (N.Y.Sup. Ct.1994) (finding therapist owed duty of care to grandmother who was alleged abuser). Or an older brother's? An aunt, uncle or teacher's?

This is a path I refuse to take. In my view, the majority decision creates a new duty which will impede appropriate treatment in the very cases of sexual abuse where it is most needed. Such an expansion of privity does not outweigh the harm it will cause.

BECK and EAKIN, JJ., join.