

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-23-1999

# Alexander v. Univ Pgh Med Ctr Sys

Precedential or Non-Precedential:

Docket 98-3402,98-3501

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Alexander v. Univ Pgh Med Ctr Sys" (1999). *1999 Decisions.* Paper 214.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/214

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 23, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-3402 and 98-3501

MARY JO ALEXANDER, as personal
representative of the Estate of Alyssa J. Alexander;
MARY JO ALEXANDER; JOHN F. ALEXANDER,
individually and as legal heirs of Alyssa J. Al exander

v.

UNIVERSITY OF PITTSBURGH MEDICAL CENTER
SYSTEM, a corporation; CHILDREN'S HOSPITAL OF
PITTSBURGH, a corporation; SUSAN ORENSTEIN, M.D.;
DEBORAH NEIGUT, M.D.; PHILIP E. PUTNAM, M.D.

      Susan Orenstein, M.D.; Deborah Neigut,
      M.D.; Philip Putnam, M.D.,
      Appellants in No. 98-3402

MARY JO ALEXANDER, as personal
representative of the Estate of Alyssa J. Alexander;
MARY JO ALEXANDER; JOHN F. ALEXANDER,
individually and as legal heirs of Alyssa J. Al exander

v.

UNIVERSITY OF PITTSBURGH MEDICAL CENTER
SYSTEM, a corporation; CHILDREN'S HOSPITAL OF
PITTSBURGH, a corporation; SUSAN ORENSTEIN, M.D.;
DEBORAH NEIGUT, M.D.; PHILIP E. PUTNAM, M.D.

      John F. Alexander; Mary Jo Alexander,
      Appellants in No. 98-3501

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civ. No. 94-00089)
District Judge: Honorable Maurice B. Cohill, Jr.

Argued May 26, 1999

BEFORE: GREENBERG and ALITO, Circuit Judges,
and DOWD,* District Judge

(Filed: July 23, 1999)

        Patrick S. Casey (argued)
        Thomas E. Johnston
        Flaherty, Sensabaugh & Bonasso
        1031 National Road
        Echo Manor, Suite 200,
         P.O. Box 6545
        Wheeling, WV 26003

         Attorneys for Appellants
         in No. 98-3501

        Larry A. Silverman (argued)
        Marcelle M. Theis
        Dickie, McCamey & Chilcote
        Two PPG Place
        Suite 400
        Pittsburgh, PA 15222-5402

         Attorneys for Appellants
         in No. 98-3402
_____

*Honorable David D. Dowd, Jr., Senior Judge of the United States
District Court for the Northern District of Ohio, sitting by designation.

2

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

A. Facts

This matter is before the court on the defendants' appeal
and the plaintiffs' cross-appeal in this medical malpractice
case. Ordinarily, following a jury verdict we set forth the
facts from the perspective most favorable to the verdict
winner. In this case, however, to the extent that the appeal
challenges the verdict, we are affirming and thus we need
not follow that practice. On the other hand, we are
reversing with respect to the district court's refusal to
charge contributory negligence and thus we set forth the
facts in a neutral manner, as the defendants were entitled
to that charge if there was any evidence to support it.

In February 1992, 17-year old Alyssa Alexander became
seriously ill, and her father took her to Wetzel County
Hospital in New Martinsville, West Virginia. After only a few
hours, Alyssa was transferred to Ohio Valley Medical
Center in Wheeling, West Virginia. On February 16, 1992,
after four days and no diagnosis, Alyssa's parents insisted
that she be transferred to Children's Hospital of Pittsburgh.

Shortly after Alyssa was admitted to Children's Hospital,
Dr. Susan Orenstein diagnosed her as having Wilson's
Disease, a rare disorder of the liver that allows excessive
amounts of copper to accumulate in various organs. Dr.
Orenstein immediately consulted with Dr. Jorge Reyes,
head of the liver transplant team at Children's Hospital. Dr.
Reyes opined that a liver transplant was probably the only
way to save Alyssa. Dr. Orenstein also consulted with Dr.
Israel Scheinberg, a New York expert in Wilson's Disease.
Dr. Scheinberg opined that Alyssa first could receive an
alternate treatment to remove copper from the body
(chelation), but that her chances of survival on this therapy
were only about 25%. Dr. Scheinberg also stated that if
Alyssa's liver function continued to deteriorate on chelation

3

therapy in the first few days, her chances of survival without a transplant were very slim. According to Dr. Orenstein, she relayed all this information to the Alexanders. Dr. Reyes also relayed to the Alexanders his belief that a transplant was necessary. In the meantime, Dr. Orenstein initiated the chelation therapy, and Alyssa's condition stabilized.

On February 27, 1992, Dr. Reyes offered Alyssa a liver for transplant and discussed his opinion with her and her parents. Dr. Orenstein testified that she discussed with the family the possibility that another liver might not become available before Alyssa's condition deteriorated, as well as the option of continuing chelation therapy. Alyssa and her parents decided not to accept the liver for transplant.

On March 2, 1992, Dr. Deborah Neigut assumed the primary care of Alyssa. Dr. Neigut saw Mrs. Alexander daily, and often discussed with her and Alyssa the risks and complications of their options. At one point, Mrs. Alexander told Dr. Neigut that she did not want Alyssa on the waiting list for a liver, but Dr. Neigut convinced her that it would not be a good idea to take Alyssa off the waiting list. While Alyssa was under Dr. Neigut's care, Dr. Reyes offered her a second liver on March 17, 1992. At that time, Alyssa's condition was stable. Dr. Neigut again discussed with the family the two options available, along with the risks and complications of each. The family refused the second liver.

Dr. Neigut then consulted with Dr. James Malatack, a pediatrician with experience in treating children with Wilson's Disease. Dr. Malatack testified that he told Mr. Alexander that the chelation therapy might work but probably would not, and that the family should accept the next available liver for a transplant. Mr. and Mrs. Alexander, however, testified that they did not learn of Dr. Malatack's recommendation until after Alyssa's death.

From March 25 to March 29 or 30, Dr. Philip Putnam assumed primary care of Alyssa. During those five days, he made no recommendations regarding transplantation, nor did he discuss with the family Alyssa's chances of survival with or without transplantation.

4

On April 1, Dr. Neigut again resumed primary care of Alyssa. On that date, Dr. Reyes offered a third liver to Alyssa. Dr. Reyes reiterated to the family his opinion that Alyssa should receive a liver transplant. Mrs. Alexander testified that Dr. Neigut recommended that the family turn down the third liver. The family did so.

On April 6, Dr. Putnam resumed primary care of Alyssa. The next day, Alyssa had a reaction to a blood transfusion which caused lung injury and sudden systemic deterioration. At Dr. Putnam's recommendation, Alyssa underwent an emergency liver transplant on April 9. She developed respiratory distress syndrome and died on April 21, 1992.

B. Procedural Background

On January 18, 1994, Mr. and Mrs. Alexander, on their own behalf and on behalf of Alyssa's estate, filed in the district court a complaint setting forth a wrongful death and survival action against the University of Pittsburgh Medical Center System ("UPMCS"), Children's Hospital, Dr. Orenstein, Dr. Neigut, and Dr. Putnam. The Alexanders alleged that the three doctors: (1) lacked the knowledge to treat and advise Alyssa; (2) failed to evaluate and interpret the diagnostic information; (3) failed to report information to the family to permit them to make informed choices; (4) misled the family as to Alyssa's true condition and prognosis; (5) failed to recommend appropriate treatment (transplant); and (6) failed to follow the recommendations of the liver transplant experts. The Alexanders sued Children's Hospital and the UPMCS as principals of the three doctors.

On December 21, 1995, the district court granted the UPMCS's motion for summary judgment. On April 20, 1998, upon stipulation of the parties, the district court dismissed Children's Hospital. The case proceeded to a jury trial as to the claims against the doctors. The doctors requested that the district court submit the issue of the Alexanders' contributory negligence to the jury but the district court denied this request.

On May 4, 1998, the jury found that each of the three doctors was negligent in advising the Alexanders regarding Alyssa's treatment, and that the negligence of each doctor

was a substantial factor in causing Alyssa's death. The jury determined that 25% of the negligence was attributable to Dr. Orenstein, 50% was attributable to Dr. Neigut, and 25% was attributable to Dr. Putnam. The jury awarded 905<!>substantial damages for pain and suffering, medical expenses, funeral expenses, and loss of services. The expenses incurred at Alyssa's stays at Wetzel County Hospital and Ohio Valley Medical Center, both of which occurred prior to Alyssa's transfer to Children's Hospital, were included in the award for medical expenses.

On May 8, 1998, the doctors filed a Fed. R. Civ. P. 50 motion for judgment as a matter of law and a Fed. R. Civ. P. 59 motion for a new trial. On May 15, 1998, the district court denied the doctors' Rule 50 motion, and on July 1, 1998, denied their Rule 59 motion. The doctors filed a timely notice of appeal on July 17. On August 25, 1998, the district court entered a final judgment in favor of the Alexanders, but reduced the amount of medical expenses awarded by $8,943.96, the expenses they incurred at the two hospitals that treated Alyssa before she was transferred to Children's Hospital. Subsequently, the doctors amended their notice of appeal to include the August 25, 1998 order. The Alexanders filed a timely notice of cross-appeal, contesting the district court's reduction of damages for medical expenses.

II. CONTENTIONS ON APPEAL

The doctors on their appeal contend that the Alexanders were guilty of contributory negligence because they rejected livers available to Alyssa during her stay at Children's Hospital. They also argue that statements by the Alexanders' counsel during closing argument were prejudicial. If we accept either of these two points, we would remand for a new trial. Dr. Putnam argues that he was entitled to a judgment as a matter of law as he was not involved in Alyssa's care when the livers were offered. On the cross-appeal, the Alexanders contend that the court erred by reducing the verdict for the medical expenses by $8,943.96 incurred at the two hospitals before she was transferred to Children's Hospital.

6

III. STANDARDS OF REVIEW

To the extent the doctors argue that the district court erred by refusing to submit the issue of contributory negligence to the jury, our review is plenary. See Woodson v. AMF Leisureland Ctrs., Inc., 842 F.2d 699, 701 (3d Cir. 1988). Similarly, we exercise plenary review with respect to Dr. Putnam's argument that the district court erred by denying his Rule 50 motion for a judgment as a matter of law. See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). Moreover, a motion for judgment as a matter of law should be granted only if viewing all the evidence in the light most favorable to the party opposing the motion, no jury could decide in that party's favor. Id. We also exercise plenary review on the cross-appeal, as the effect of the district court's action in reducing the verdict was to grant the defendants a judgment as a matter of law with respect to the expenses involved.

IV. DISCUSSION

A. Contributory Negligence

The doctors first argue that the district court erred in refusing to allow the jury to consider whether the Alexanders were contributorily negligent in rejecting Dr. Reyes' three offers for a liver transplant. The doctors assert that evidence exists from which the jury could have concluded that the Alexanders were informed fully and completely of the risks to Alyssa in rejecting these livers and thus were negligent in doing so, and that the Alexanders' negligence contributed to Alyssa's death. Thus, the doctors contend they are entitled to a new trial.

Under Pennsylvania law, which is applicable here, if there is any evidence of contributory negligence in a medical malpractice case, the court must submit the issue to the jury, even if the evidence to the contrary is strong. Althaus v. Cohen, 710 A.2d 1147, 1157 (Pa. Super. Ct. 1998); Pascal v. Carter, 647 A.2d 231, 233 (Pa. Super. Ct. 1994); Levine v. Rosen, 575 A.2d 579, 580-81 (Pa. Super. Ct. 1990); see also Ayoub v. Spencer, 550 F.2d 164, 167 (3d Cir. 1977) (recognizing Pennsylvania law in submitting issue of contributory negligence to jury). In addition, the

7

plaintiff's negligent conduct must be a proximate cause of her injury; if there is no evidence of causation between the plaintiff's negligence and her injuries, the trial court properly may refuse to instruct the jury on contributory negligence. Althaus, 710 A.2d at 1157–58. Of course, in Pennsylvania contributory negligence if established will be an aspect of a comparative negligence analysis. See Ferguson v. Panzarella, 700 A.2d 927, 930 (Pa. 1997).

Here, the district court erred in refusing to submit the question of the Alexanders' contributory negligence to the jury. We set forth in detail the evidence which leads us to this conclusion.

## 1. Dr. Reyes' Testimony

Dr. Reyes testified that he told the Alexanders that Alyssa needed a transplant. App. at 513. He testified that he spoke directly to the Alexanders because he was concerned about Alyssa and her family and wanted to make sure they knew "the risks for and against transplantation." App. at 522. Dr. Reyes testified that he told Alyssa and her parents that "Alyssa had a better chance of recovery with a liver transplant." App. at 530. He testified that Alyssa and Mrs. Alexander "did not want a liver transplant." Id. Dr. Reyes testified that he provided the Alexanders with all the appropriate information concerning a transplant, including the risks in transplantation and in refusing transplantation, because he "felt that there was going to be a bad outcome without a transplant," but that he never directly stated that Alyssa must have a transplant. App. at 534. Dr. Reyes also testified that when Alyssa was in intensive care, Mr. Alexander told him that they (the Alexanders) "had made a mistake and a bad decision" in refusing the livers. App. at 536.

## 2. Dr. Orenstein's Testimony

Dr. Orenstein testified that she told the Alexanders about the note Dr. Scheinberg (the New York expert in Wilson's Disease) wrote, in which Dr. Scheinberg opined that survival without a liver transplant was unlikely. App. at 406, 438, 1080. Dr. Orenstein testified that when the first liver was offered, she and the Alexanders "had a very detailed discussion about the significant risks of

deterioration abruptly without being able to get another liver." App. at 440. Dr. Orenstein remembered specifically communicating the risks involved in rejecting a liver. App. at 1075. She also testified that the Alexanders were "provided with all relevant medical information concerning treatment options and concerning risks, benefits and possible complications, available treatment options," during the period of time in which Alyssa was under Dr. Orenstein's care, and that the Alexanders "were very clear about the treatment options." App. at 446. Dr. Orenstein testified that although she did not "advocate transplant," she never advised against it. App. at 1103.

3. Dr. Neigut's Testimony

Dr. Neigut testified that she considered a transplant an option throughout the period when she was Alyssa's primary care physician, and that the family was aware of that option. App. at 338. Dr. Neigut testified that when the second liver was offered, she discussed with Mrs. Alexander and Alyssa the risks and complications of their options. App. at 349-50. She also testified that each time a liver was offered, she discussed several times with Mrs. Alexander and Alyssa the "risks of acute problems developing" if they rejected the liver. App. at 366, 1594. Dr. Neigut testified that Mrs. Alexander said that she wanted to take Alyssa off the waiting list for a liver, but that Dr. Neigut recommended that Alyssa stay on the list. App. at 1617, 1618. Dr. Neigut testified that she never advised against a transplant. App. at 1630, 1646.

4. Dr. Malatack's Deposition

Dr. Malatack (an outside consultant) testified that after he examined Alyssa, he told Mr. Alexander that it was possible that chelation therapy would work, but that he suggested transplantation. App. at 1360, 1364. Dr. Malatack testified that he told Mr. Alexander that they should accept the next available liver. App. at 1371.

5. Mr. Alexander's Testimony

Mr. Alexander testified that the transplant team told him that Alyssa needed a transplant. App. at 810. Mr. Alexander testified that he wrote in his journal that Dr.

9

Reyes told him that a transplant was probably the only thing that would help Alyssa. App. at 841. Mr. Alexander testified that on a "couple different occasions," Dr. Reyes told him he wanted to perform transplant surgery. App. at 847, 866, 882. Mr. Alexander testified that Drs. Orenstein and Neigut told them about the options of transplant and chelation. App. at 843. Mr. Alexander also testified that he made the ultimate decision to reject the first liver. App. at 869–70. He also testified that he, his wife, and Alyssa made the decision to reject the second and third livers. App. at 873–75.

6. Mrs. Alexander's Testimony

Mrs. Alexander testified that the transplant team advocated performing transplant surgery. App. at 899. Mrs. Alexander testified that Dr. Reyes and the transplant team came to Alyssa's room to check on her "at least a couple of times a week." App. at 908. Mrs. Alexander testified that Dr. Reyes continually recommended that they accept the next available liver for transplant. App. at 929–30. In particular she said "Well, they always said, you know, she needed the transplant."

Based on this evidence, a jury could have concluded that the Alexanders were negligent in rejecting the three offers for a liver transplant, and that their negligence was a substantial factor in causing Alyssa's death. While the Alexanders counter that they cannot be negligent for following the negligent advice of the three doctors, they concede that they shared responsibility in the decision-making process and, in any event, the record fully supports a conclusion that they did so. Still, they contend that the doctors adduced no independent evidence that they acted negligently.

We reject the Alexanders' contentions because the doctors are correct that evidence exists from which the jury could have concluded that they were informed fully of the risks involved in treating Alyssa through chelation therapy and through transplantation. Clearly, evidence also exists from which the jury could have concluded that the Alexanders' decisions to reject three offers for a liver transplant substantially contributed to Alyssa's death.

10

Inasmuch as there was such evidence, the district court erred by refusing to submit the issue of the Alexanders' contributory negligence to the jury. Thus, a new trial is necessary.

In reaching our result we have taken note of Judge Alito's statement in his dissent that "[t]he negligent advice provided by the defendant physicians was found by the jury to have caused a young woman's death." Conc. Op. at 18. Nevertheless, Dr. Orenstein pointed out that the one year survival rate following liver transplants was from 65% to 85% and was lower thereafter. App. at 407. Thus, even if the Alexanders had elected the transplant they had no assurance that Alyssa would survive. In the circumstances it is entirely possible that regardless of what the doctors had advised, Alyssa would have died. The unfortunate fact is that the Alexanders did not have a good choice and may have been negligent in making the choice they did.

Finally, with respect to contributory negligence, the doctors correctly point out that this case is both a survival and wrongful death action and in a footnote in their brief they address the ramifications of a contributory negligence defense in this situation. Br. at 19 n.6. The Alexanders have not addressed the point in their brief. In the circumstances, we leave the resolution as to how to deal with the contributory negligence defense to the district court on remand.

B. Improper remarks during closing

Alternatively, the doctors argue that counsel for the Alexanders made improper and prejudicial statements during his closing argument that were so blatant that a new trial is warranted. In view of our result, we need not consider this point but we observe that the Alexanders' attorney was close to, if not over, the edge of what is acceptable.

C. Denial of Dr. Putnam's Rule 50 Motion

Dr. Putnam argues that the district court erred in denying his Rule 50 motion for a judgment as a matter of law because he was not negligent, and even if he was negligent, there is no evidence that his negligence was a

11

proximate cause of Alyssa's injuries and death. In particular, while Dr. Putnam concedes that he was Alyssa's primary care provider from March 25 through March 29, he correctly points out that no livers became available during those few days. He also correctly notes that no evidence suggests that he ever advised the Alexanders to reject a liver transplant. He alternatively argues that if he was negligent in giving advice during those few days, his negligence was not a factor in causing Alyssa's death.

The Alexanders respond that the evidence shows that at the time Dr. Putnam assumed primary care of Alyssa on March 25, he knew that Dr. Reyes had concluded that a transplant was the only way to save Alyssa. Dr. Putnam also knew that Dr. Reyes already twice had offered Alyssa a liver and that she was still on the waiting list. Dr. Putnam also knew that Drs. Neigut and Orenstein were reluctant to make such an assertive recommendation.

Additionally, one of the Alexanders' expert witnesses, Dr. Brewer, testified that in mid-March, a "very, very ominous turn of events" occurred. App. at 571. According to Dr. Brewer, tests in mid-March showed a reduction in the production of certain enzymes, an indicator that Alyssa's liver was failing and was so damaged that it never would recover. Id. If Dr. Putnam had reviewed Alyssa's chart properly and recognized these warning signs, the Alexanders argue, he would have recommended transplantation. He did not, and on April 1, the Alexanders rejected the third liver.

It is true that Dr. Putnam was no longer Alyssa's primary care provider on April 1. Nonetheless, the third liver became available just a day or two after his primary care of Alyssa ended. In this regard, the record is unclear whether Dr. Putnam's primary care of Alyssa ended on March 29 or March 30. Thus, it was reasonable for a jury to conclude that Dr. Putnam was negligent in not informing the Alexanders about Alyssa's deterioration in mid-March and in not recommending that they accept the next available liver. The evidence suggests that Dr. Putnam's negligence was less than Dr. Neigut's or Dr. Orenstein's, and the Alexanders recognize as much. Nevertheless, record evidence supports the jury's finding that Dr. Putnam was

12

negligent and that his negligence contributed to Alyssa's death. Thus, the district court did not err in denying his Rule 50 motion for a judgment as a matter of law.

D. The Cross-Appeal

On cross-appeal, the Alexanders argue that the district court erred by reducing the jury's award for medical expenses by $8,943.96, the amount of expenses incurred at the two hospitals where Alyssa was taken before being transferred to Children's Hospital. The Alexanders assert that they should be reimbursed for the expenses incurred at the other two hospitals because the doctors' negligence rendered those expenses futile. Plainly, this argument lacks merit and requires little discussion.

In fact, the Alexanders recognize that they are entitled to "damages that reasonably flow from the tortious act." Br. at 20. Here, the doctors' only possible tortious act was failing to recognize and recommend to the Alexanders that a liver transplant was the only way to save Alyssa's life. Obviously, the medical expenses the Alexanders incurred before Alyssa ever came under the care of these doctors did not reasonably flow from the negligence of these doctors.

V. CONCLUSION

For the foregoing reasons, to the extent that the doctors, i.e., Dr. Putnam, appeal from the order denying the motion for a judgment as a matter of law in its order of May 15, 1998, we will affirm. To the extent that the doctors appeal from the order of July 1, 1998, denying their motion for a new trial, we will reverse. We also will reverse the order of August 25, 1998, entering a final judgment for the Alexanders but will affirm the order to the extent that it denied the Alexanders a recovery of $8,943.96 for expenses before Alyssa was transferred to Children's Hospital. We will remand the case for a new trial and for such other proceedings as may be appropriate consistent with this opinion. The parties will bear their own costs on this appeal.

13

DOWD, District Judge, concurring:

Although I concur completely in Judge Greenberg's opinion, I write separately merely to clarify some points which I believe may provide additional guidance to district courts.

This case, involving a young girl who lost her life, is naturally laden with emotion. It is no surprise that Alyssa's parents want to place responsibility for her death somewhere. What parent would not long to find a reason for the untimely death of a child? Unfortunately, the extremely sympathetic and sensitive nature of this case puts it squarely in a category of cases that can be difficult to deal with because ultimate resolution of the issues may not be particularly satisfying to any of the parties involved. Nonetheless, courts of law are often asked to resolve just such controversies. In doing so, a court must attempt to set aside raw emotion and/or personal preferences and simply apply the law.

An important issue in this appeal is whether the district court erred in refusing to instruct the jury on the defense of contributory negligence. As properly pointed out by Judge Greenberg, "under Pennsylvania law, which is applicable here, if there is any evidence of contributory negligence in a medical malpractice case, the court must submit the issue to the jury, even if the evidence to the contrary is strong." Maj. Op. at 7 (citing cases). One case not cited by Judge Greenberg is even stronger in its requirement that the issue go to the jury. In Berry v. Friday, 472 A.2d 191 (Pa. Super. Ct. 1984), 1 the appellant argued that the contributory negligence charge given by the trial court constituted error because the facts of the case did not allow for an inference of contributory negligence.2 The court stated:

_____

1. In Berry, malpractice was alleged where a treating physician permitted his patient with a heart condition to return to work without first inquiring as to the specific nature of the patient's work duties which, as it turned out, entailed heavy lifting.

2. In instructing the jury on contributory negligence, the trial court "[tied] in the law with its possible application to the facts, specifically mentioning Mr. Berry's weight and smoking problems." Berry, 472 A.2d at 194 (footnote omitted).

14

> While we agree that the evidence in the case does not strongly favor a finding of contributory negligence, we cannot ignore the slim possibility. As stated by our Supreme Court, "where there is any evidence which alone would justify an inference of the disputed fact, it must go to the jury, no matter how strong or persuasive may be the countervailing proof."

Id. at 194 (quoting Heffernan v. Rosser , 419 Pa. 550, 554–55, 215 A.2d 655, 657 (1966)). Like it or not, Pennsylvania law gives very little discretion to the trial judge 3 and requires a contributory negligence charge even when contributory negligence is only a slim possibility. 4

Judge Alito is troubled by the fact that, in his view, the Alexanders cannot be found to have acted unreasonably in following the advice of their primary care physicians. Dis. Op. at 21. Maybe that is true; but that is precisely the issue which a jury, not a trial judge, must decide under Pennsylvania law. The trial judge's role is to ascertain whether there is "any evidence" which might support a finding of contributory negligence. If, as in the instant case, there is such evidence, it is for the jury to decide whether there was contributory negligence. To resolve that question, the jury, not this court, will have to decide whether the Alexanders' conduct was reasonable under the circumstances. If their conduct was not reasonable, they may be found contributorily negligent if that conduct is also found to be a proximate cause of Alyssa's death.

My thoughts on this matter are somewhat influenced by Fish v. Gosnell, 463 A.2d 1042 (Pa. Super. Ct. 1983). In that case, Fish was plowing snow out of his driveway,

_____

3. Often a trial judge has the duty and the discretion to determine whether there is sufficient evidence for an issue to go to the jury. Under Pennsylvania law, however, it appears that even a scintilla of evidence on the issue of contributory negligence is sufficient to constitute a jury issue.

4. The Berry court further noted that"a party's negligence must be submitted to the jury unless there is no evidence from which an affirmative finding could be made without resort to speculation." Berry, 472 A.2d at 194 n.4 (emphasis added) (quoting Yandrich v. Radic, 435 A.2d 226, 228 (Pa. Super. Ct. 1981)).

15

operating his garden tractor plow near the berm of the highway. As Gosnell drove by in his automobile, he struck Fish, resulting in severe and permanent injuries. A jury found Gosnell 80% negligent and Fish 20% negligent, awarding Fish a net verdict of $64,000. The trial court later added 10% per annum in pre-award delay damages under Pa.R.Civ.P. 238. On appeal, Fish's argument that the trial court erred in refusing to instruct on the defense of assumption of the risk was rejected.

In the instant case, there has apparently never been an argument relating to assumption of the risk. However, the Fish court's discussion of that issue throws some light on the concept of contributory negligence in a situation where, as here, great loss has been suffered by the persons against whom the defense is leveled. On the theory that these persons have suffered enough, a trial judge might be reluctant to permit the contributory negligence defense. Fish, however, illuminates:

> Prosser explains that the negligent encountering of traffic is not assumption of the risk by this example, "A pedestrian who walks across the street in the middle of a block, through a stream of traffic travelling at high speed, cannot by any stretch of the imagination be found to consent that the drivers shall not use care to avoid running him down." W. Prosser, [Law of Torts] at 445. Accord Hildebrand v. Minyard, 16 Ariz.App. 583, 494 P.2d 1238 (1972).
>
> . . . [Fish] may have been foolhardy and negligent, but he cannot be said to have consented that oncoming drivers abandon their duty of care to keep their vehicles under sufficient control in the snowy conditions to avoid a collision. . . . [Fish's] entire course of conduct is properly analyzed as possible negligence, and was thus correctly submitted to the jury as possible comparative negligence. . . .

Fish v. Gosnell, 463 A.2d at 579.

A properly instructed jury might ultimately conclude that the Alexanders acted unreasonably, precisely because the advice of Alyssa's primary care physicians and consulting specialists was in stark conflict, that the Alexanders were

16

fully informed regarding the risks of chelation as opposed to transplantation, and that they were contributorily negligent for having chosen to pursue the less aggressive therapy in the face of the very real risk of Alyssa's death absent a liver transplant. On the other hand, a properly instructed jury might also find that the Alexanders acted entirely reasonably precisely because even the doctors could not agree on what should be done. The jury might conclude, exactly as Judge Alito would, that the physicians should not "escape all or part of the liability for their malpractice because the young woman and her parents were foolish to have followed their bad advice." Dis. Op. at 18.

In addition, as in Fish, supra, a reasonable jury could find that the Alexanders were negligent to ignore the advice of specialists (which made clear that Alyssa would probably die without a liver transplant) in favor of the advice of non-specialists (who recommended less aggressive treatment), while at the same time finding (as the jury did in this case) that the defendants had abandoned their duty of care. The Alexanders, like people stepping out into traffic, could still reasonably expect that their doctors, like the drivers, would exercise due care under the circumstances. It is possible for a jury to find negligence on both sides, in which case damages must be apportioned under Pennsylvania's Comparative Negligence Act. 42 Pa.C.S.A. S 7102.

No matter how strong might be this court's opinion or preference as to how this case should turn out, no matter how troubling this court might find the notion that the Alexanders, who have already suffered a great loss, somehow contributed to that loss, the issue of contributory negligence is not a determination for the court. The issue should have been submitted to the jury.

17

ALITO, Circuit Judge, dissenting:

The negligent advice provided by the defendant physicians was found by the jury to have caused a young woman's death,[5] and the defendants do not contest the sufficiency of the evidence supporting that finding. They now argue, however, that they should escape all or part of the liability for their malpractice because the young woman and her parents were foolish to have followed their bad advice. The majority holds that the trial judge should have charged the jury on this defense. In my view, however, there is no evidence that the girl and her parents were negligent. Their only mistake was to trust the defendants' advice, which, although negligent, was not so implausible on its face that lay people should have known better than to have followed it. I therefore dissent.

I.

It is important to keep in mind that the jury found that the defendants "were negligent in advising [the Alexanders] regarding options for the treatment of her condition," see app. at 1860, and that the defendants do not dispute the fact that there was sufficient evidence to support this finding. The defendants, contrary to the advice of the experts who were consulted regarding Alyssa's condition, never recommended a liver transplant but instead advocated the use of chelation therapy.

1. Dr. Scheinberg

Dr. Scheinberg, an expert on Wilson's disease, testified that when the livers became available, chelation therapy was not a reasonable option. See App. at 686-87. By failing to recommend strongly in favor of a transplant, Dr. Scheinberg testified, the defendants violated the applicable standard of care. See id. at 687.

_____

5. See App. 1861 (verdict sheet showing jury found defendants' negligence was "a substantial factor in causing Alyssa Alexander's death").

18

## 2. Dr. Neigut

Dr. Neigut, one of the defendants, testified that when the second liver became available, she advised the Alexanders that "there was no clear-cut indication that[a liver transplant] would be imperative . . . to avoid death" and that the transplant was not "the only option." Id. at 349. Dr. Neigut stated that when the third liver became available, she told Mrs. Alexander that she "did not see an urgent need at that point to pursue the transplant." Id. at 359. She also testified that she advocated chelation therapy and explained to the Alexanders that Alyssa would be in a better condition in the long-term if they avoided a transplant. See id. at 360.

Dr. Neigut also said that it was "reasonable" for the Alexanders to rely on her advice because she was their primary care physician. See id. at 373-74. She testified that, as Alyssa's primary care physician, she had daily contact with Alyssa and was "primarily responsible for collating all [of the] information, for reasoning through all [of the] information, and making recommendations to the family." Id. at 373.

## 3. Dr. Orenstein

Dr. Orenstein, another defendant, testified that when the first liver became available, she "agreed with" the Alexanders that chelation therapy was a reasonable way to proceed. See id. at 408. Dr. Orenstein also testified that she discussed the risks of electing to continue chelation therapy but stressed that chelation therapy was the "preferred" method of treatment. See id. at 440. Dr. Orenstein did not dispute that she told the Alexanders that it would be appropriate for them to reject the livers. See id. at 425-26. Dr. Orenstein further testified that her recommendations were reasonable, despite Dr. Reyes's contrary suggestions, because she "was examining Alyssa everyday (sic) and going through things in more detail than . . . Dr. Reyes had the time to do . . . ." Id. at 414.

## 4. Mr. Alexander

Mr. Alexander testified that the defendants persuaded the family to reject the liver transplant option in favor of

19

chelation therapy. For instance, Mr. Alexander testified that Dr. Neigut recommended that they should "pass" on the livers. See id. at 885. He testified that Dr. Neigut told the Alexanders that Alyssa had a good chance of survival without a transplant and that the chelation therapy was improving Alyssa's condition. See id. Mr. Alexander also testified that Dr. Orenstein stated that "everything looks great" and that "she doesn't see any need at all for a transplant." Id. at 818.

5. Mrs. Alexander

Mrs. Alexander testified that Dr. Neigut stated that a liver transplant was not necessary. See id. at 904. She further testified that Dr. Orenstein recommended that they should continue chelation therapy because Alyssa's lab reports were improving. See id. at 901.

II.

The majority notes that, according to the testimony of Drs. Orenstein and Neigut, they never advised against a transplant. See Maj. Op. at 9. However, it is undisputed that they never advised in favor of a transplant until it was too late and that they instead consistently recommended chelation therapy. It is obvious, therefore, that the jury inferred that the defendants implicitly advised against a transplant (by instead recommending an alternative method of treatment) and that this implicit recommendation was negligent and was the proximate cause of Alyssa's death. And, as previously noted, the sufficiency of the evidence to support the jury's finding is not contested on appeal.

Therefore, the defendants are essentially arguing that, although they negligently steered the family in a direction that proved fatal, they should not be held fully responsible for their actions because other doctors provided non-negligent information. The real question before us, then, is the following: in view of the fact that the defendants implicitly advised against a transplant and that this advice constituted medical malpractice, was there evidence that Alyssa, a young woman hospitalized with a life-threatening disease, and her parents, neither of whom had any medical background, were contributorily negligent in heeding the

20

defendants' implicit advice rather than that of the consultants who strongly recommended in favor of the transplant? I do not think so.

The defendants have cited no Pennsylvania case, and I have uncovered none, that requires a contributory negligence charge under the circumstances presented here. Indeed, the only cases even remotely similar held that the instructions on contributory negligence were proper because the plaintiffs failed to follow the advice of their primary care physicians. See Ferguson v. Panzarella, 700 A.2d 927, 930 (Pa. Super. 1997) (holding contributory negligence charge proper where plaintiff failed to attend scheduled doctor's appointments); Morganstein v. House, 547 A.2d 1180, 1184 (Pa. Super. 1988) (holding contributory negligence charge proper where plaintiff disregarded physician's instructions about working and taking medication).

Here, the Alexanders followed the advice of their primary care physicians, and I fail to see how this can be deemed unreasonable. Indeed, Dr. Neigut conceded at trial that the Alexanders decision to rely upon her advice to forego the livers and continue with chelation therapy was "reasonable" because she was Alyssa's primary care physician. See App. at 373-74. And, as their primary defense at trial, the defendants argued that their decision to recommend chelation therapy over liver transplantation was medically reasonable. See Defendants' Closing Arg., App. at 1714 ("[C]helation, [the] medical approach, was a reasonable one . . . .").

I suppose that I can imagine an extreme case in which a physician's advice is so transparently wrong that a reasonable lay person would be negligent in heeding it. Here, however, the defendants' advice was not so obviously bad on its face that it fell into this category, and I do not think that the Supreme Court of Pennsylvania would allow them to escape all or part of their liability on contributory negligence grounds. Except perhaps in truly extreme cases, it is not negligent for a patient such as Alyssa or her parents to follow the advice of primary care physicians. To hold otherwise puts patients in an impossible position, undermines the relationship between patients and their

21

primary care physicians, and gives grossly negligent physicians an unwarranted way to escape malpractice liability. I therefore dissent.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit